EDENS VIEW REALTY & INVESTMENT, INC., Plaintiff-Appellee, *v.*
HERITAGE ENTERPRISES, INC., Defendant-Appellant.

First District (5th Division)   No. 79-1436

Opinion filed August 1, 1980.

Michael J. Rovell and Robert A. Wason, both of Chicago (Jenner & Block, of counsel), for appellant.

Harvey J. Barnett, of Chicago (Barnett & Beigel, Ltd., of counsel), for appellee.

Mr. JUSTICE LORENZ delivered the opinion of the court:

Plaintiff brought an action to recover a real estate broker's commission in connection with the sale of defendant's nursing home located in Ottawa, Illinois. Following a bench trial, the trial court entered judgment in plaintiff's favor for $35,000 plus costs of the suit. Defendant appeals from this judgment, and contends on review that (1) the written listing agreement between plaintiff and defendant was void; (2) plaintiff was not the procuring cause of the sale of defendant's nursing home; (3) plaintiff was not entitled to compensation from defendant under the theory of *quantum meruit*; (4) plaintiff's award should have been limited to that of a reasonable finder's fee; (5) plaintiff's award was erroneous since it acted as agent for both the purchaser of the nursing home and defendant without the latter's knowledge; (6) plaintiff's recovery should have been denied because it employed an unlicensed individual who negotiated on its behalf for the listing and sale of the nursing home; (7) the trial court erred in excluding evidence of other properties brought to plaintiff's attention by this unlicensed individual; and (8) the trial court improperly relied upon facts not in evidence in rendering judgment for plaintiff.

Plaintiff cross-appeals, contending that it was improperly denied prejudgment interest on the award it received.

Defendant employed plaintiff on April 3, 1975, as a real estate broker to sell its nursing home. This employment agreement was based upon a letter sent by defendant to plaintiff under which defendant "commissioned" plaintiff to represent defendant in the sale of its nursing home, and further agreed to pay plaintiff a 5 percent commission for its services. The letter stated:

> "* * * I would like to officially commission your firm in representing us in the sale of our nursing home in Ottawa, Illinois.
>
> Our organization will agree to a 5 per cent commission of the sales price of the building payable at closing."

This letter was the result of a conversation between Alex Green and Joseph Warner, defendant's chief executive officer. In March of 1975, Warner originally contacted Green, who was then employed by First Health Care Corporation (First Health Care) to see if First Health Care was interested in purchasing its nursing home. Green told Warner that First Health Care was not interested.

Several weeks later, Green telephoned Warner to see if the nursing home was still available. Green told Warner that he was no longer employed by First Health Care, but was aware of an agency that specialized in buying and selling nursing homes and offered to inform the agency of the proposed sale of defendant's nursing home. Warner expressed an interest in hiring the agency, and sent Green a letter with information about the nursing home indicating that defendant's asking price for the facility was $750,000. Green then turned the letter over to Leon Zarkin, president of plaintiff.

Green contacted Warner again, and asked him if defendant would be willing to list the nursing home with plaintiff, whose usual commission for such a sale was 7 percent. Warner thought that commission to be too high, so Green told him to write Zarkin a letter expressing what defendant was willing to pay for plaintiff's services. Warner sent Zarkin the letter dated April 3, 1975, which "commissioned" plaintiff to sell the nursing home for 5 percent of the purchase price of the building.

A few days later, Zarkin contacted David Gorenstein, a nursing home administrator with whom he had prior business dealings, and informed him of the availability of defendant's nursing home. Zarkin also told him about the purchase price, the size, the lot, and all other information he had about the nursing home. After Zarkin told Gorenstein that plaintiff was serving as broker for defendant, the two unsuccessfully attempted to arrange a time convenient for both to view the property. Eventually, Zarkin gave Warner's telephone number to Gorenstein and suggested that he contact Warner directly.

Gorenstein called Warner in April of 1975 and made an appointment to visit the property. They later met without Zarkin in Ottawa, Illinois, to negotiate the sale of the nursing home. Lengthy negotiations ensued between Gorenstein and Warner for the next few months. During these negotiations, Zarkin called Gorenstein to check on the progress of the negotiations, but Zarkin never visited the nursing home nor met with Warner. Then Zarkin received a letter from Warner dated June 21, 1975, which purportedly terminated the April 3, 1975, listing agreement between plaintiff and defendant. The letter stated that defendant would not pay the fee designated in the April 3, 1975, letter because plaintiff's services as a real estate broker were "unsatisfactory." Warner's letter further stated:

> "As I said we recognize the fact that you passed on our name to the potential buyer. A reasonable fee may be negotiated for that service and nothing more."

In June of 1975, Gorenstein was having difficulty arranging conventional financing for the purchase of the nursing home. Therefore, Gorenstein and Warner orally agreed the following month that Gorenstein would purchase the nursing home on contract for $700,000 rather than the original asking price of $750,000. The written contract between Gorenstein and defendant to that effect was executed in October of 1975. Thereafter, defendant refused plaintiff's demands for the brokerage fees owing from the sale of the nursing home.

The trial court found for plaintiff in the amount of $35,000 plus costs of suit, which was the full 5 percent commission on the $700,000 purchase price of the nursing home. Plaintiff's request for prejudgment interest on the award was denied. The trial court indicated that plaintiff's award was justified on the basis of both the listing agreement and under a theory of *quantum meruit.*

OPINION

Defendant's initial contention is that the written listing contract between plaintiff and defendant was void for violation of section 19 of the Real Estate Brokers and Salesmen License Act (the Act) (Ill. Rev. Stat. 1977, ch. 111, pars. 5701-5743), which provides in pertinent part:

> "No registrant shall obtain any written listing contract which does not provide for automatic expiration within a definite period of time. * * *. Any listing contract not containing a provision for automatic expiration shall be void." Ill. Rev. Stat. 1977, ch. 111, par. 5737.

Defendant argues that its April 3, 1975, letter to plaintiff is a "listing contract" according to the Act, and since it contained no expiration date for plaintiff's services, it is void and bars plaintiff's recovery.

Plaintiff responds by asserting that defendant's letter does not constitute a contract, but is merely a "listing" and falls outside of the Act.

Defendant's letter "commissioned" plaintiff to sell defendant's nursing home in return for payment of 5 percent of the purchase price. Plaintiff made no oral or written promises in response to this letter to use its best efforts to sell the property. In short, defendant's letter was merely an offer of a unilateral contract which was accepted by the actual rendition of plaintiff's services in securing a purchaser for the nursing home. In *Dixon v. Betten* (1971), 2 Ill. App. 3d 708, 277 N.E.2d 355, the court analyzed a similar listing agreement and found Corbin on Contracts §50 (1963), in a section titled "Real Estate Brokerage and Other Agency Cases," to be helpful in explaining why only a unilateral contract exists:

> " 'The cases with which we are now dealing include those in which an owner merely puts his land in the broker's hands, promising him a commission for the service of producing an able and willing purchaser, the broker making no return promise that he can or will produce such a purchaser. Such a transaction as this is an offer of a unilateral contract, an offered promise by the owner creating in the broker a power of accepting by actual rendition of the requested service.' " *Dixon*, 2 Ill. App. 3d 708, 710-11, 277 N.E.2d 355, 357.

■■ Regardless of whether the agreement in the instant case was unilateral or bilateral in nature, the listing agreement remains void under section 19 of the Act. The section makes no distinction between unilateral and bilateral listing agreements. Both, in the absence of an automatic expiration date, have no effect. Section 19 of the Act was obviously designed to prevent an owner's land from stagnating indefinitely in one broker's hands on the market. A time limitation is necessary because an owner may find it difficult to revoke the agency agreement with the broker after the broker has made substantial endeavors to sell the property. (See 1 Williston on Contracts §§59-60A (3d ed. 1957).) The legislative purpose of section 19 is consistent with the purpose of the Act, which has been construed to be not a penal measure, to be strictly construed against the State, but a broad statutory system, interpretation of which must regard the State's interest in protecting the public from the effects of improper conduct by real estate salesmen. *Ranquist v. Stackler* (1977), 55 Ill. App. 3d 545, 551-52, 370 N.E.2d 1198, 1203, *cert. denied* (1978), 439 U.S. 926, 58 L. Ed. 2d 318, 99 S. Ct. 309.

Because the listing contract relied upon by plaintiff as a basis for compensation is void, the trial court erred in allowing recovery under this theory.

Defendant next contends that the trial court erred in finding that plaintiff was the procuring cause of the sale of its nursing home. In *Cole v.*

*Brundage* (1976), 36 Ill. App. 3d 782, 344 N.E.2d 583, the court found plaintiff's jury instruction 12 to accurately state the law on what constitutes the "procuring cause" of a sale. That instruction reads as follows:

> "A broker is deemed to be the procuring cause of a sale, and he is entitled to be paid, if he was instrumental in bringing the buyer and seller together and if a sale was thereafter made by the seller to the buyer as a result thereof. Under such circumstances, the real estate broker is entitled to be paid even though other persons may have participated in the negotiations, and even though negotiations may have been conducted by the buyer and seller at which the broker was not present, and even though the sale was made without the broker's being present or without his knowledge." *Cole*, 36 Ill. App. 3d 782, 805 n.9, 344 N.E.2d 583, 601 n.9.

In the present case, it is uncontroverted that Zarkin gave Gorenstein the telephone number of Warner, along with all the information he had concerning defendant's property. Gorenstein and Warner had never met prior to Zarkin's intercession. Their eventual negotiations were continuous and uninterrupted, and culminated in the sale of defendant's nursing home. Based upon these facts, we hold that plaintiff was instrumental in bringing the buyer and seller together and was thus the procuring cause of the sale of defendant's property.

It is of no consequence that Zarkin did not meet with Warner and Gorenstein to negotiate the sale or ever visit the nursing home. A broker's right to commission depends on whether the sale was procured through his efforts or through information derived from him, and cannot be defeated if the owner makes a sale himself or through another broker. *Van C. Argiris v. Caine Steel Co.* (1974), 20 Ill. App. 3d 315, 314 N.E.2d 361.

Defendant also contends that the trial court erred in concluding that plaintiff's award was equally justified under a theory of *quantum meruit*. In essence, defendant alleges that plaintiff's recovery under this theory is prevented for two reasons: (1) this theory was not pleaded in plaintiff's complaint, and (2) plaintiff came before the court with unclean hands, an equitable defense to recovery under *quantum meruit*.

As to the first allegation, we note that in Illinois, a plaintiff may recover under *quantum meruit* on a claim made under an express contract *without amendment of the pleadings* where the plaintiff fails to establish the express contract but does show that in fact services were rendered. (*Slater v. Jacobs* (1977), 56 Ill. App. 3d 636, 371 N.E.2d 1054.) Plaintiff's failure to include *quantum meruit* in its complaint which sought contractual relief, is therefore not fatal to its recovery under this theory.

The defense of unclean hands raised by defendant is likewise without

merit. Although this defense is equitable in nature and plaintiff's action in the present case was brought at law, the right to recovery under *quantum meruit* is governed by principles of equity. (*Dickerson Realtors, Inc. v. Frewert* (1974), 16 Ill. App. 3d 1060, 307 N.E.2d 445.) We shall therefore address the merits of this defense.

It is a fundamental rule that one seeking equitable relief cannot take advantage of his own wrong or, as otherwise stated, he who comes into equity must come with clean hands. (*Metcalf v. Altenritter* (1977), 53 Ill. App. 3d 904, 369 N.E.2d 498.) This doctrine, however, is not a judicial straightjacket, and its application is a matter for sound judicial discretion. *Mascenic v. Anderson* (1977), 53 Ill. App. 3d 971, 369 N.E.2d 172.

Basically, defendant asserts that plaintiff's recovery is precluded as a result of its wrongdoing in falsely stating to Warner, in a letter from plaintiff's attorney, that Zarkin had shown the nursing home to Gorenstein. Turning to the record, we find that Zarkin testified at trial that the attorney who drafted that letter was mistaken in stating that Zarkin had visited the facility. Gorenstein, on the other hand, stated that Zarkin discussed with him the possibility of representing to Warner that Zarkin had accompanied him to the facility. The trial court, which observed the demeanor of the witnesses, found the testimony of Zarkin rather than the others to be credible. The record reveals no other instances of alleged misconduct sufficient to bar plaintiff's claim. Therefore, the defense of unclean hands is not available to defendant.

■■ In the law, "quantum meruit" means literally "as much as he deserves." (*Nardi & Co. v. Allabastro* (1974), 20 Ill. App. 3d 323, 314 N.E.2d 367.) It is an expression that describes the extent of liability on a contract implied by law, and is predicated on the reasonable value of services performed. (*Nardi.*) The basis for recovery under this theory is receipt by a defendant from a plaintiff of a benefit which is unjust for him to retain without paying for it. *Arthur Rubloff & Co. v. Drovers National Bank* (1980), 80 Ill. App. 3d 867, 400 N.E.2d 614.

In this case, as the trial court noted in its findings, a valuable service was rendered defendant when plaintiff put it in contact with the ultimate purchaser. At trial, Gail Spencer, a real estate expert, testified that the customary real estate brokerage commission for the sale of a nursing home under one million dollars ranges between 5 percent to 10 percent. In addition, defendant recognized the value of plaintiff's future services in its April 3, 1975, letter that offered plaintiff 5 percent of the purchase price if it found a purchaser for its facility. Indeed, defendant later acknowledged in its June 21, 1975, letter to plaintiff that a "reasonable fee" was due plaintiff for passing on its name to the buyer. That fee was unjustly retained by defendant who would have had to pay a like amount to another broker in plaintiff's absence.

■■ Although plaintiff's contractual recovery is precluded under section 19 of the Act, no purpose of the Act is served by denying plaintiff compensation for its services. The Act only prohibits *written* listing contracts without automatic expiration dates. There is no requirement under the Act or under the statute of frauds (Ill. Rev. Stat. 1977, ch. 59, par. 2) that brokerage agreements must be in writing or that claims for brokerage commissions need to be based upon a written instrument. Therefore, we do not circumvent the prohibitions of the Act by allowing plaintiff's recovery without the aid of a written agreement. Plaintiff acted swiftly in locating a purchaser for defendant's nursing home. Defendant accepted the services of plaintiff and continued, without interruption, to negotiate for the sale of its property with the buyer produced by plaintiff. It is the policy of the law to protect a broker who has been employed or authorized to act and who, in good faith, has so acted. (*Arthur Rubloff & Co. v. Comco Corp.* (1978), 63 Ill. App. 3d 362, 380 N.E.2d 15.) Consequently, the trial court properly concluded that plaintiff's award was supported under the theory of *quantum meruit*.

Defendant contends in the alternative that plaintiff's award should have been limited to that of a reasonable finder's fee of one-fifth of the 5 percent brokerage commission.

In support, defendant points to the trial testimony of Chris Zouvas, a real estate expert, who testified that this amount is customarily paid to a broker who refers a purchaser to a second broker with whom property is listed. Defendant also cites *Anderson v. Gewecke* (1976), 36 Ill. App. 3d 170, 343 N.E.2d 673, as authority that a broker can recover a finder's fee in certain circumstances where *quantum meruit* is properly pleaded. In *Anderson*, the court affirmed the trial court's award of $35,000 as a finder's fee to plaintiffs for their services in bringing to the attention of defendants the possibility of purchasing and developing certain land in Arizona. The court found that the trial court based this award on two factors: (1) plaintiffs had been offered $35,000 by defendants to relinquish their interest in the transaction and (2) defendants saved $35,000 from the purchase price by eliminating plaintiffs from the transaction and acquiring the property without their knowledge. The court held that the amount awarded to plaintiff was purely a factual issue to be determined by the trial judge which would not be disturbed unless manifestly contrary to the weight of the evidence. *Anderson*, a pure finder's fee case, did not involve a dispute as to whether a broker's commission was due plaintiffs, nor did it establish that a reasonable finder's fee was equal to one-fifth of the normal brokerage commission. It is therefore of no aid to the instant defendant.

In this appeal, the trial court heard expert testimony that a broker's act of giving a name to an individual who ultimately purchases the

property is worth 5 percent to 10 percent of the purchase price of the property. Defendant saved $35,000, 5 percent of the purchase price, in not paying plaintiff the commission, an amount it would have had to pay another broker for securing a purchaser for its home. The testimony relied upon by defendant with regard to a finder's fee was obviously of little weight to the trial court since defendant's analogy to the "referring broker" situation did not apply to the facts of the case at bar. Because the trial court's finding was not contrary to the manifest weight of the evidence, we will not alter its finding on review.

Defendant next contends that plaintiff should be denied recovery because it acted as agent for both the purchaser and defendant without defendant's knowledge. Defendant argues that this dual agency is supported in the record in that Zarkin allowed Gorenstein to negotiate directly with Warner without clearing this arrangement with the latter, and also because Gorenstein testified that he and Zarkin discussed the possibility of forming a partnership to purchase defendant's nursing home.

A broker who has acted as agent for both buyer and seller without the full knowledge of both is not allowed to recover compensation from either. (*Duffy v. Setchell* (1976), 38 Ill. App. 3d 146, 347 N.E.2d 218.) Generally, an agent is defined as one who undertakes to manage some affairs of another by his authority, subject to his control and on his account. (*Krug v. Machen* (1974), 24 Ill. App. 3d 526, 321 N.E.2d 85.) There is no evidence in the record that plaintiff was subject to the control of Gorenstein or that it acted on Gorenstein's behalf. Although Zarkin suggested that Gorenstein and Warner negotiate directly, they were apparently satisfied with this arrangement. Notwithstanding, Zarkin was under no duty to supervise or participate in these meetings. The possibility of a partnership between Gorenstein and Zarkin never materialized. Therefore, the trial court was correct in rejecting defendant's argument to this effect.

Defendant also contends that plaintiff was erroneously allowed to sue and recover for compensation in the sale of defendant's nursing home because it employed an unlicensed individual, Alex Green, who allegedly negotiated for the listing and sale of defendant's property.

Section 3 of the Act provides:

"It is unlawful for any person to act as a real estate broker or real estate salesman * * * without a certificate of registration issued by the Department of Registration and Education." (Ill. Rev. Stat. 1977, ch. 111, par. 5703.)

In addition, section 7 of the Act provides:

"No action or suit shall be instituted, nor recovery therein be had, in any court of this State by any person, copartnership,

association, or corporation for compensation for any act done or service rendered, the doing or rendering of which is prohibited under the provisions of this Act to other then registered real estate broker or real estate salesmen unless such person, copartnership, association, or corporation was duly registered hereunder as a real estate broker or real estate salesman prior to the time of offering to perform any such act or service or procuring any promise or contract for the payment of compensation for any such contemplated act or service." Ill. Rev. Stat. 1977, ch. 111, par. 5714.

The trial court specifically found that Green's involvement was collateral to the issues of the suit. Therefore, it can be assumed that the trial court implicitly concluded that either Green was unemployed by plaintiff during its dealings with defendant or that Green's conduct did not constitute that of a broker or salesman under the Act. These conclusions are logically consistent with the prohibitions of section 7, which prevents plaintiff from recovering any compensation if it employed an unregistered person who acted as a real estate broker or salesman on its behalf during its search for a purchaser of defendant's property.

Although the testimony is conflicting as to the exact date of Green's employment with plaintiff, the trial court chose to believe the trial testimony of Zarkin, who stated that he and Green began negotiating toward an employment contract after Green passed his broker's examination and received his license. These negotiations culminated in a written employment agreement executed in October of 1975. Plaintiff rendered its services for defendant in April of 1975, months before Green even negotiated with Zarkin for employment with plaintiff.

■■ Moreover, Green's conduct does not fall within the definition of "broker" or "salesman" under the Act. Section 4.02 of the Act provides:

> " 'Broker' means any person, * * * who for compensation or valuable consideration *sells or offers for sale, buys or offers to buy, or negotiates the purchase or sale or exchange of real estate,* * * * or who performs any of the foregoing acts for his own account while engaged in the business of buying or selling real estate." (Emphasis added.) (Ill. Rev. Stat. 1977, ch. 111, par. 5706.)

Section 4.03 of the Act defines a "salesman" as follows:

> " 'Salesman' means any person who for compensation or valuable consideration is employed either directly or indirectly by a real estate broker or by such attorney-in-fact as is exempted in this Section from the provisions of this Act or by any one person, copartnership, or corporation regularly engaged in the business on his or its own account, and not as a broker or agent for others, of buying, selling, or leasing real estate, *to sell or offer to sell, or to*

*buy or offer to buy, or to negotiate the purchase or sale or exchange of real estate,* or to lease or offer for lease, to rent or offer for rent, any real estate, or to negotiate the leases thereof or of the improvements thereon." (Emphasis added.) Ill. Rev. Stat. 1977, ch. 111, par. 5707.

In this case, Green directed Warner to plaintiff as a possible broker for the sale of defendant's property. The testimony is conflicting as to whether Green participated in the negotiation of the eventual listing agreement. This determination is irrelevant, however, because the Act does not require individuals to be licensed in order to refer a real estate broker to a property owner or to negotiate a listing agreement. If this requirement existed, an attorney unlicensed in the practice of real estate would be prohibited from negotiating a listing agreement for a broker-client.

The record shows that Green did not "sell or offer for sale, buy or offer to buy, or negotiate the purchase or sale or exchange of the real estate." (Ill. Rev. Stat. 1977, ch. 111, pars. 5706, 5707.) In short, he did not perform the statutory or traditional functions of a broker or salesman. Green's only contact with the transaction is evidenced by Gorenstein's testimony that Green participated in a telephone call with Zarkin and him in which one of the two gave Gorenstein a description of the facility. Green had no recollection of this incident. Based upon these facts, it is our opinion that Green's involvement in the transaction was minimal. His actions were not those of a broker or salesman under the Act.

Defendant also contends that the trial court erred in excluding evidence of other properties brought to plaintiff's attention by Green. During cross-examination of Green, defense counsel attempted to discredit Green's assertion that he had no expectation of compensation at the time he referred defendant to plaintiff. When defense counsel began questioning Green about other properties listed as an exhibit to the employment agreement between plaintiff and Green in an alleged effort to show a course of conduct between the two, plaintiff's counsel objected on relevancy grounds. The objection was sustained. Defendant argues that the trial court's ruling was erroneous and prevented it from introducing material evidence which would cast doubt upon Green's statement that he referred defendant to plaintiff solely to get in the latter's "good stead" for possible future employment.

The scope of cross-examination is a discretionary determination for the trial court which will not be upset on review absent an abuse of that discretion. (*Sweeney v. Max A. R. Matthews & Co.* (1970), 46 Ill. 2d 64, 264 N.E.2d 170.) While testimony elicited from Green regarding expectations of compensation for the properties listed on the exhibit may have disparaged his testimony on direct examination, it may also have digressed into areas relating to those properties which are collateral to the

issues of the suit. We also note that defense counsel made no offer of proof at trial as to the scope or direction of the expected testimony. Therefore, any attempt to now evaluate its probative value serves no purpose. The trial court's decision to limit defendant's cross-examination did not amount to an abuse of discretion and will not be disturbed.

Defendant's final contention is that the trial court assumed facts not in evidence in rendering judgment for plaintiff. The contention is based upon certain comments made by the trial court in explaining its decision. The judge stated:

> "The 5 per cent of the sales price * * * was and is a reasonable fee for the service rendered. And that was, in his [Warner's] words, merely passing along the name of the purchaser who eventually purchased the property, and I will tell you—I will paraphrase his words, and I will tell you why I feel that way. For seven months and probably before, this property had been for sale. I am sure that Mr. Warner had contacted other people, that he did not rely merely on Mr. Green and Mr. Green's friends, Mr. Zarkin, to sell his property. In all that time they never came up with anybody who would match Mr. Gorenstein's offer of $100,000 down and $600,000 of his own note, in seven months, they could not come up with another buyer to match it, knowing if they could have come up with another buyer to match it, they would alleviate the problem of possibly having a lawsuit. It just makes common sense.
>
>           * * *
>
> It seems further to the court that purchasers of this type of property at the time of the sale were very rare indeed, and that the defendant was fortunate to have been put in touch with Gorenstein through the plaintiff. That, in itself, was worth 5 per cent in this court's view."

Defendant asserts that this statement shows that the court improperly assumed that defendant had contacted persons other than plaintiff to sell the property, that those persons never found purchasers who would match Gorenstein's offer, and that purchasers of nursing homes were rare.

A trial judge in a nonjury case may draw reasonable inferences from the facts. In the instant case, the reasons cited by the trial court in explaining its findings were valid inferences from the evidence. First, it was reasonable to assume that Warner had contacted persons other than plaintiff to sell the property and that Warner found no other purchasers. Plaintiff's listing agreement with defendant was nonexclusive in nature, and it can be inferred that defendant arranged it in this fashion so it could simultaneously solicit the aid of other brokers. Also, Warner never testified that there were any other prospective purchasers or offers made

for the property, and it is therefore reasonable for a trial court to deduce that there were none. Second, the trial court's statement regarding the scarcity of purchasers for nursing homes could have been based upon the fact that defendant lowered its asking price $50,000 and assisted Gorenstein in financing the purchase rather than seeking out other purchasers or demanding the original price from Gorenstein.

Even assuming that these inferences were improper, the trial court's decision is otherwise supported by ample evidence contained in the record. In our discussion of plaintiff's award under *quantum meruit*, we reviewed the evidence adduced at trial in support thereof. The trial court specifically mentioned a few of those factors in its ruling—namely, that plaintiff put defendant into contact with the purchaser and that defendant admitted prior to trial that it owed plaintiff remuneration for its services. Because the trial court's decision is fully supported by competent evidence in the record, any erroneous inferences from facts not in evidence are harmless.

Plaintiff, in its cross-appeal, contends that the trial court erred in denying its prejudgment interest on the $35,000 award.

Under Illinois law, prejudgment interest may be awarded on money due under the Interest Act (Ill. Rev. Stat. 1977, ch. 74, pars. 1-11), which states in pertinent part:

> "Creditors shall be allowed to receive at the rate of five (5) per centum per annum for all moneys after they become due on any bond, bill, promissory note, or other instrument or writing; * * * and on money withheld by an unreasonable and vexatious delay of payment." Ill. Rev. Stat. 1977, ch. 74, par. 2.

Plaintiff asserts that an award of prejudgment interest is justified under the facts of this case for two reasons: (1) defendant's commission letter of April 3, 1975, is an "instrument of writing" and (2) defendant's refusal to pay plaintiff its commission was "unreasonable and vexatious."

■ Our decision as to whether defendant's commission letter is an "instrument of writing" under the Interest Act is not necessary because we have found the letter to be void. Plaintiff's award is founded upon *quantum meruit* which merits no statutory interest.

■ Plaintiff's assertion that defendant delayed the payment of funds due it for the sale of the nursing home in an "unreasonable and vexatious" fashion is also unconvincing. Where payment is delayed as a result of litigation, plaintiff must establish conduct by a litigant "which approximates actual fraud" to come within the statutory language. (*Hamilton v. American Gage & Machine Corp.* (1976), 35 Ill. App. 3d 845, 853, 342 N.E.2d 758, 765.) This determination is an issue of fact for the trial court. (*Hamilton.*) Defendant allegedly refused payment to plaintiff in the belief that it was not obligated to do so under the law. An honest

dispute as to the existence of a legal obligation does not constitute an unreasonable and vexatious delay which would permit recovery of interest. *Weiland Tool & Manufacturing Co. v. Whitney* (1968), 100 Ill. App. 2d 116, 241 N.E.2d 533, *rev'd on other grounds* (1969), 44 Ill. 2d 105, 251 N.E.2d 242.

We recognize that the trial judge found "premeditation" on defendant's behalf in refusing payment, and are aware that the judge also opined that defendant offered its theories of defense as "afterthoughts." It was that same trial judge, however, who denied interest to plaintiff after carefully listening to all the witnesses and arguments by counsel. Apparently, the trial judge ruled that defendant's conduct was not "premeditated" to the extent of constituting the unreasonable behavior contemplated by the statute. We cannot say that this determination was contrary to the manifest weight of the evidence. In our opinion, the trial judge correctly denied plaintiff's claim for prejudgment interest.

Accordingly, the judgment in plaintiff's favor for $35,000 plus costs of suit is affirmed. The judgment denying plaintiff interest is also affirmed.

Affirmed.

SULLIVAN, P. J., and MEJDA, J., concur.