EUGENE PIETKA, Plaintiff-Appellee and Cross-Appellant, *v.* CHELCO CORPORATION, Defendant-Appellant and Cross-Appellee.—(BUILDING MANAGEMENT CORPORATION, Defendant-Cross-Appellee.)

First District (5th Division)    No. 81-584

Opinion filed June 18, 1982.

James J. Flynn and Corinne Chandler, both of Quinn, Jacobs & Barry, of Chicago, for appellant.

Robin J. Omahana, of Coffield, Ungaretti, Harris & Slavin, of Chicago, for appellee.

No brief filed for cross-appellee.

PRESIDING JUSTICE SULLIVAN delivered the opinion of the court:

Defendant Chelco Corporation (Chelco) appeals from a judgment entered on a verdict for plaintiff in his action to recover a real estate broker's commission allegedly for obtaining a tenant for Chelco's property. The issues presented are that (1) the verdict was against the manifest weight of the evidence; (2) the jury was improperly instructed as to (a) plaintiff's burden of proof in establishing his authority and (b) the definition of procuring cause; and (3) the trial court erred in permitting plaintiff to impeach his own witness on the issue of procuring cause. In a cross-appeal, plaintiff contends that the trial court erred (1) in denying leave to amend his complaint by adding a claim for a monthly management commission allegedly owed under his employment contract; and (2) in denying him prejudgment interest.

Plaintiff's original complaint alleged in substance that he was a licensed real estate broker associated with defendant Building Management Corporation (Building Management),[1] which acted as agent of Chelco, and that he secured the Walter Frank Organization, Inc. (Walter Frank), as the tenant for Chelco's property located at 3201 West Randolph, Bellwood, Illinois (the building)—for which he was entitled to a commission. The record also indicates that Building Management is a real estate management corporation and that Chelco is a real estate holding company having title to several buildings.

---

[1] Building Management was dismissed from this action by directed verdict at the close of plaintiff's case.

Plaintiff testified that in October 1973 he was hired by Richard M. Ryan, then president of Building Management, and Wallace E. Carroll to administer and manage Building Management property—which included finding tenants and buyers; that he was initially paid a salary, but upon becoming president of Building Management and during his tenure in that post, he was also to be paid a percentage from rentals and sales; that Carroll authorized him to find a tenant for 50,000 square feet of available space in the building; that with Carroll's authorization in January 1974, he placed a sign on the building with his name and telephone number, which replaced another sign showing Building Management and Ryan's name and telephone number; that he placed an advertisement in the Sunday Chicago Tribune, distributed circulars, and made several personal contacts, and in January 1974 obtained a tenant named Stratton Hats for a portion of the building—for which he was paid a commission; that on July 23, 1974, he received a telephone message from Joyce Lowry, his secretary, concerning an inquiry about the building from Edward McGrath of Walter Frank, and he set up an appointment with McGrath to view the property on July 26; that on that date he gave McGrath and John Cranfill—Walter Frank's director of manufacturing—a tour of the property, during which McGrath indicated that Walter Frank would require an additional 25,000 square feet; that he gave McGrath a set of floor plans for the building and, after the tour, wrote a letter to McGrath and Cranfill containing information on the property and enclosing a circular concerning the building; that after confirming with Carroll and Morrow Garrison that additional space was available, he told McGrath that 75,000 square feet was rentable and thereafter made several other follow-up telephone calls; that he met with McGrath at Walter Frank's facility less than two weeks later to determine the feasibility of Walter Frank's renting the space in the building and confirmed McGrath's continued interest; that approximately three weeks after this final contact with McGrath, plaintiff was terminated by Building Management; and that, subsequently, upon learning a lease had been signed between Walter Frank and Chelco, he wrote a letter to Ryan, dated February 24, 1975, claiming a commission for procuring that lease.

Joyce Lowry testified that on July 24, 1974, she was in the employ of Building Management when McGrath called concerning the property and asked for plaintiff; that since plaintiff was not in, she described the building and took a message for him; that she referred McGrath to George Holz, who was not employed by Chelco, for a tour of the building—all of which actions plaintiff had authorized; and that she gave plaintiff the message upon his return.

Edward McGrath testified that in 1974, while employed by Walter Frank, it was his sole responsibility to find a new location for that or-

ganization, and he first learned about the property in question during the spring of 1974 when he saw a sign on the building with Ryan's name and telephone number on it, which he then called and asked for Ryan; that he did not see the Tribune advertisement nor did he recall telling an investigator in 1976 that he first heard about the building through the advertisement; that he was shown the building twice before contacting Ryan— the first time by Holz, who gave him no documents; that he met Holz 3 to 4 months before he met plaintiff; that 3 or 4 months later, he again contacted Building Management about the building, and a woman made arrangements for plaintiff to give McGrath a tour; that plaintiff picked him up, showed him the building, and sent him a confirming letter dated July 26, 1974; that plaintiff gave him no blueprints of the building and never informed him that an additional 25,000 square foot area was available; that several months later, he again called Building Management and asked for plaintiff but, upon being informed plaintiff was no longer with Building Management, he was transferred to Ryan.

Morrow Garrison testified that he did not recall when the sign in question was placed on the building or taken down, nor did he know what address and phone number were on the sign; that he had not seen the sign, but when Holz told him about it in the summer of 1974, he (Garrison) ordered plaintiff to remove it because it was unauthorized; that when it was removed, he saw Ryan's sign underneath; that Ryan took McGrath on a third tour of the building during which Ryan called Garrison, who told Ryan that an additional 25,000 square foot area was available for leasing; that plaintiff never discussed with him the leasing of the property to Walter Frank nor had he (Garrison) received a copy of the July 26, 1974, confirming letter; that he generally discussed the availability and negotiability of space in the building but denied talking to plaintiff about leasing 75,000 square feet to Walter Frank; that plaintiff had indicated to him the possibility of obtaining a tenant for the building but declined to tell him who it was; that the lease negotiations with Walter Frank commenced in September or October of 1974, and the lease was signed December 17 or 18, 1974; that in negotiating the lease, he conferred with Thomas Carroll—president of Chelco—and Wallace Carroll concerning its terms; and that final approval of the lease provisions was made by Thomas Carroll.

Wallace Carroll testified that he gave no authority to plaintiff to put up a sign or to find a tenant for the building and that he made no promise to pay plaintiff a commission for finding a tenant or to pay him a percentage of rents on various properties.

The jury rendered a verdict against Chelco for $22,038.01, upon which judgment was entered and this appeal followed.

At the commencement of trial, the trial court had denied plaintiff

leave to amend his complaint to add a count (count II), asserting a claim for recovery of a monthly management commission. The court did, however, allow plaintiff to amend his complaint to allege an oral contract of employment between the parties and the terms and conditions thereof, but the prayer for relief was limited to recovery of the brokerage commission alleged in count I. The trial court denied the post-trial motion of plaintiff for prejudgment interest, and plaintiff has cross-appealed from the orders denying motions for leave to amend (count II) and for prejudgment interest.

OPINION

Defendant first contends the jury's finding that plaintiff was the procuring cause of the lease between Chelco and Walter Frank was against the manifest weight of the evidence.

■■ In general, a broker is entitled to a commission if he is the procuring cause of a consummated transaction which he was employed to negotiate (*Edens View Realty & Investment, Inc. v. Heritage Enterprises, Inc.* (1980), 87 Ill. App. 3d 480, 408 N.E.2d 1069), and a broker may be deemed the procuring cause if he brings together the parties who ultimately consummate the transaction (*Chiagouris v. Continental Trailways* (1964), 50 Ill. App. 2d 196, 200 N.E.2d 399) or if he is instrumental in its consummation (*Edens View Realty & Investment, Inc. v. Heritage Enterprises, Inc.*, 87 Ill. App. 3d 480, 485, 408 N.E.2d 1069, 1074; *Van C. Argiris Co. v. Caine Steel Co.* (1974), 20 Ill. App. 3d 315, 314 N.E.2d 361; *Doss v. Kirk* (1956), 8 Ill. App. 2d 536, 132 N.E.2d 49). Various means have been recognized as constituting a bringing together of the parties. See, *e.g., Cowan v. Day* (1910), 156 Ill. App. 105 (evidence that at request of broker, a third party informed ultimate purchaser that property was for sale, so that broker neither communicated with purchaser nor showed her the property); *Adams v. Decker* (1889), 34 Ill. App. 17 (broker merely sent to principal the party who ultimately purchased the property).

■■ Conversely, a broker also may become the procuring cause on the basis of the negotiations he conducts, even though he does not take part in bringing the parties together initially. (See *Burns v. Sullivan* (1915), 192 Ill. App. 127 (abstract) (holding that negotiations carried on by second broker brought about sale, making second broker the procuring cause and not plaintiff who had originally brought parties together and introduced purchaser to seller but who were unable to come to terms until second broker re-opened negotiations).) Moreover, a real estate broker may be the procuring cause where the transaction is effectuated through information which he disseminates (*Edens View Realty & Investment, Inc. v. Heritage Enterprises, Inc.* (1980), 87 Ill. App. 3d 480, 485, 408 N.E.2d 1069, 1074; *Doss v. Kirk* (1956), 8 Ill. App. 2d 536, 540-41, 132 N.E.2d 49,

51), although it has been noted that in such cases, the broker actually may do more than supply information (Note, *Real Estate Brokers: The Procuring Cause*, 41 Chi.-Kent L. Rev. 58, 63 (1964)). Furthermore, a broker may be deemed the procuring cause of the transaction even though he did not personally introduce the parties to each other (*Rigdon v. More* (1907), 226 Ill. 382, 80 N.E. 901; *Chiagouris v. Continental Trailways* (1964), 50 Ill. App. 2d 196, 198, 200 N.E.2d 399, 401), or accompany a customer to a meeting with the principal (*Chicago Title & Trust Co. v. Guild* (1946), 329 Ill. App. 374, 68 N.E.2d 615), or if others participated in the negotiations (see *Cole v. Brundage* (1976), 36 Ill. App. 3d 782, 344 N.E.2d 583; *Woolf v. Hamburger* (1916), 201 Ill. App. 612 (abstract), or the transaction was concluded without his presence or knowledge (*Hafner v. Herron* (1896), 165 Ill. 242, 46 N.E. 211; *Day v. Porter* (1896), 161 Ill. 235, 43 N.E. 1073; *Martin v. Equitable Life Assurance Society of the United States* (1944), 323 Ill. App. 69, 54 N.E.2d 899 (abstract); *Vancil v. Walter* (1944), 323 Ill. App. 291, 55 N.E.2d 305 (abstract)). The foregoing rules reflect a policy of the law to protect a broker employed or authorized to act and who, in good faith, has so acted on behalf of his principal. *Arthur Rubloff & Co. v. Comco Corp.* (1978), 63 Ill. App. 3d 362, 380 N.E.2d 15.

In light of the above principles and of the record before us, we conclude that the jury's finding that plaintiff was the procuring cause of the Walter Frank lease was not against the manifest weight of the evidence.

The first significant action of plaintiff in the chronology leading to the signing of the lease in question was his placement of an advertisement for the building in the Sunday Chicago Tribune Industrial Real Estate section in 1974. In our view, the jury could have found that the advertisement facilitated McGrath's contact with Chelco. Although McGrath testified at trial that his first contact with Chelco was through the sign on the building, a statement he previously had given to an investigator that he first learned about the building through an advertisement in the Tribune was admitted in evidence. Moreover, because McGrath's sole function as an employee of Walter Frank was to find a new location for its manufacturing plant, the jury could reasonably have inferred that McGrath saw the advertisement even though it may not have been his initial contact.

Plaintiff's second crucial action was his placement of a sign on the building in January 1974. The significance of such action is apparent, inasmuch as McGrath testified that his first contact with Building Management was from the sign. Plaintiff testified that he installed his sign and removed the sign containing Ryan's name and telephone number. That testimony was corroborated somewhat by the evidence that Building Management had recently moved, which made the address and telephone

number on the old sign incorrect. McGrath testified, on the other hand, that he first learned about the sign in the spring of 1974; that it contained Ryan's name and telephone number; and that when he called the number on the sign, a woman answered and referred him to Holz. Other testimony indicated, however, that the phone was answered by Joyce Lowry, plaintiff's secretary, who testified that the call was for plaintiff and because he was not there that she referred McGrath to Holz.

In contrast to the above testimony concerning the sign was that of George Holz. He expressed the belief that plaintiff's sign was in place for 4 to 6 weeks. This was based on his recollection of first noticing it in July and of seeing the Ryan sign when he showed the building to McGrath. Moreover, Garrison testified that he had no first-hand knowledge as to when the sign was put up or taken down; but he did know that when it was removed, Ryan's sign was underneath. Garrison's testimony regarding the sign thus conflicted with that of Holz, who testified that both plaintiff's and Ryan's signs were visible simultaneously. Thus, the jury could have reasonably inferred that the Ryan sign, with Building Management's old address and telephone number on it, was not on the building in January 1974 or that it was completely obscured by plaintiff's.

Additionally, it appears that the jury could have concluded that plaintiff's sign was authorized. Although Garrison testified that he had not authorized plaintiff to place the sign on the building, Wallace Carroll could not recall having any such discussion with plaintiff and thus did not specifically contradict plaintiff's position. Plaintiff testified that Carroll had told him on three occasions to put up a sign, and there was no dispute that either Carroll or Garrison had the authority to order plaintiff to do so. On those facts, the jury was warranted in believing that plaintiff installed the sign which attracted McGrath's attention.

The third significant event was McGrath's July 23 telephone call. Lowry stated that McGrath asked for plaintiff, not Ryan, and that she described the building and referred McGrath to Holz since plaintiff was out of town. Although McGrath testified that he met Holz in the spring of 1974—some 3 to 4 months before meeting plaintiff—Holz stated that he showed the property to McGrath in the late spring or early summer, and the record indicates that Garrison said Holz told him that he showed the building on June 10 or 15. In any event, despite the differences between the parties' account of the events, it seems clear that the Holz tour of July 23, as authorized by plaintiff, was a significant factor in the procurement of the lease.

Furthermore, the jury also could have found that the Holz tour does not support Chelco's claim of being the procuring cause. McGrath testified that Holz gave him no documents, and he could not recall if Holz gave him rental information. He also stated that Holz told him 75,000

square feet—the space McGrath sought—was not available. Holz testified that he had been told to refer inquiries to Chelco, which he did by telling McGrath to contact Garrison. Moreover, the record indicates that McGrath contacted plaintiff for a second tour of the building, and there is no indication of any contact between McGrath and Garrison in this regard.

Plaintiff's other activities concerning the building are also important on the question of procuring cause. On July 23, plaintiff called McGrath to arrange an appointment for July 26 to tour the building and to discuss a lease. Thereafter, plaintiff picked up McGrath and Cranfill at Walter Frank's offices and conducted them on a one-hour tour during which he answered questions concerning various aspects of the building, including rental and sales information. He also told them he would confirm the availability of the additional 25,000 square feet they needed and that, at the conclusion of the tour, he gave them a set of floor plans. Later, plaintiff confirmed the tour by sending them a letter, the receipt of which was admitted by McGrath, in which was enclosed additional information on the building. It appears that plaintiff pursued the lease further by calling Carroll and Garrison to verify that 75,000 square feet could be made available, and neither denied this call.[2] Plaintiff also testified that on the same day he called and gave McGrath this information and that he made other follow-up telephone calls to McGrath even after he was terminated by Building Management. Finally, it is significant that plaintiff testified to visiting McGrath and Cranfill at Walter Frank's plant and office in early August to observe the layout of the manufacturing operation and to help McGrath determine how Walter Frank's equipment could fit into Chelco's facility.

Among the events following July 23, it appears that the next time McGrath called Building Management, he asked for plaintiff, who by then had been terminated. This fact could reasonably have suggested to the jury that McGrath desired further negotiations and that he believed such negotiations were to be conducted through plaintiff. Such inference is reinforced by the evidence that prior thereto, Garrison did not contact McGrath after Holz informed him (Garrison) of giving McGrath a tour of the building. (*Cf. O'Leary v. Crow* (1978), 60 Ill. App. 3d 135, 376 N.E.2d 392 (where the sale was consummated through the efforts of a second broker in an independent solicitation); *Modern Tackle Co. v. Bradley Industries, Inc.* (1973), 11 Ill. App. 3d 502, 297 N.E.2d 688 (where sale of business was procured through efforts of second broker after plaintiff

---

[2] Although plaintiff declined to disclose to Garrison the identity of Walter Frank as the potential tenant, that fact has no bearing on the question of procuring cause, inasmuch as the contacts between the parties were still at the preliminary negotiation stage.

failed to interest purchaser who declined offer of sale).) Thus, even if the negotiations that ultimately led to the lease did not begin until after the third tour, plaintiff had already taken the necessary preliminary steps that made those negotiations possible at that time, and there is no indication of an independent solicitation or a rejection of Chelco's terms following the tour by plaintiff. Moreover, it has been held that, as here, where the agreement provides that if the broker produces a customer with whom a transaction is subsequently completed the broker shall be paid a commission. *Rigdon v. More* (1907), 226 Ill. 382, 80 N.E. 901.

■■ While the record reveals extensive conflict in the testimony, we are of the view that it is supportive of plaintiff's position that he brought the parties together and was instrumental in the consummation of the transaction. Resolution of contradictory testimony is not a function of the reviewing court, which cannot reevaluate the evidence and set aside a jury verdict merely because it could have reached a different conclusion (*Ryon v. Javior* (1979), 69 Ill. App. 3d 946, 387 N.E.2d 936; *Brown v. Johnson* (1978), 60 Ill. App. 3d 76, 378 N.E.2d 757), even if there is conflicting evidence on factual questions which is of substantially equal weight (*Bentley v. City of Chicago* (1979), 79 Ill. App. 3d 1028, 398 N.E.2d 912). That task rests instead with the jury, which evaluates the weight of the evidence and assesses the credibility of witnesses, and its findings will not be disturbed unless the verdict was palpably erroneous (*Russo v. Checker Taxi Co., Inc.* (1978), 67 Ill. App. 3d 379, 385 N.E.2d 33) or the opposite verdict is clearly compelled or the findings appear to be unreasonable, arbitrary, and not based on the evidence (*Duffek v. Vanderhei* (1980), 81 Ill. App. 3d 1078, 401 N.E.2d 1145). The evidence before us does not suggest that the jury's findings were unreasonable or that the verdict was palpably erroneous and compelled the opposite result, and we therefore hold that the verdict was not contrary to the manifest weight of the evidence.

Chelco next contends that plaintiff's instructions Nos. 9 and 11 improperly implied that prior authority to offer space for lease in the building, if proved, governed the determination of plaintiff's authority with respect to the Walter Frank lease. Instruction No. 9 on plaintiff's burden of proof (Illinois Pattern Jury Instruction, Civil, No. 21.02 (2d ed. 1971) (modified) (IPI)) in pertinent part required plaintiff to prove:

> "Second, that the plaintiff had an agreement with defendant Chelco Corporation to procure tenants for *said building*;
>
> Third, that the plaintiff was the procuring cause of the lease of *said building* to the Walter Frank Organization, dated December 18, 1974." (Emphasis added.)

Plaintiff's instruction No. 11 (non-IPI) stated, in pertinent part:

"Plaintiff is not required to demonstrate any particular form of agreement with the defendant for the leasing of the *building*." (Emphasis added.)

Chelco here asserts that use of the words "said building" in No. 9 and "Building" in No. 11, rather than the phrase "available space" foreclosed the jury from considering Chelco's position that plaintiff lacked authority to secure a tenant for the space leased to Walter Frank and that a narrower instruction should have been given which referred only to the space actually leased by Walter Frank. The effect of those instructions, according to Chelco, assumed plaintiff had broader authority and unduly emphasized the Stratton Hats lease which plaintiff had previously obtained. We find no merit to this contention.

■■■ In general, the criterion for determining the adequacy of jury instructions is whether, taken as a whole and in series, they fairly, fully, and comprehensively apprised the jury as to applicable legal principles (*Jensen v. Chicago & Western Indiana R.R. Co.* (1981), 94 Ill. App. 3d 915, 419 N.E.2d 578), and a jury instruction should not assume as true any version of disputed facts which the jury should be expected to resolve (*Pioneer Hi-Bred Corn Co. of Illinois v. Northern Illinois Gas Co.* (1975), 61 Ill. 2d 6, 329 N.E.2d 228). In this regard, one of the elements plaintiff was required to prove was that he was authorized to find tenants for Chelco in his capacity as a broker. (See *Horan v. Blowitz* (1958), 13 Ill. 2d 126, 148 N.E.2d 445; *El Reno Wholesale Grocery Co. v. Stocking* (1920), 293 Ill. 494, 127 N.E. 642.) We believe, however, that by instructing the jury that plaintiff was to prove he had authority to find a tenant for "said building," the trial court necessarily informed them that plaintiff had to demonstrate his authority to find a tenant for the "available space" within the building. Thus, rather than precluding consideration of defendant's position, the instructions in question encompassed it. Instructions Nos. 9 and 11 did not, therefore, assume as true any disputed version of facts but left such determination to the jury.

■■ Furthermore, concerning Chelco's reference to the Stratton Hats lease, we do not think the challenged instructions permitted the jury to conclude that since plaintiff was authorized to secure the Stratton Hats lease, he was also authorized to obtain the Walter Frank lease. Neither does the record indicate that plaintiff had authority to obtain the Stratton Hats lease but lacked authority to procure other tenants. The potential for such errors was, in our view, eliminated by the specific reference to the lease given to Walter Frank. By that reference, the jury was instructed to determine whether plaintiff was authorized to find a tenant for the space which Walter Frank leased. Moreover, contrary to Chelco's contention, the giving of instruction No. 11 was consistent with the law of this State which provides that a broker's authority may be implied from the

conduct of the principal. (*Cole v. Brundage* (1976), 36 Ill. App. 3d 782, 344 N.E.2d 583; *Van C. Argiris Co. v. Caine Steel Co.* (1974), 20 Ill. App. 3d 315, 314 N.E.2d 361.) Although the jury must not be instructed in a confusing or misleading manner (*Silverman v. General Motors Corp.* (1981), 99 Ill. App. 3d 593, 425 N.E.2d 1099), a common sense view of the challenged instructions does not suggest that the jury was confused or misled or that it was not comprehensibly informed on the issue of plaintiff's authority. We conclude, therefore, that there is no merit in Chelco's contention that plaintiff's instructions Nos. 9 and 11 were improperly given.

■■ Chelco further maintains that plaintiff's instructions Nos. 12 and 12F repetitively instructed the jury as to what was not required in order to establish procuring cause and thereby afforded the jury no guidance in determining if plaintiff was the procuring cause of the instant lease. Instructions Nos. 12 and 12F (non-IPI) provided:

"In order for the plaintiff to be regarded as the procuring cause of the lease of the [building], the plaintiff must show that he was instrumental in bringing the parties together. It is not necessary for the plaintiff to have personally introduced the tenant to the defendant. It is sufficient if the lease was effected through the efforts of the plaintiff, or through information derived from him.

It is not necessary for the plaintiff to have been physically present at the closing of the lease in order for the plaintiff to be regarded as the procuring cause of the lease."

Inasmuch as those instructions accurately stated relevant principles of law, as discussed above, and are supported by evidence in the record (see *Figarelli v. Ihde* (1976), 39 Ill. App. 3d 1023, 351 N.E.2d 624; *Biggerstaff v. New York, Chicago & St. Louis R.R. Co.* (1957), 13 Ill. App. 2d 85, 141 N.E.2d 72), they gave the jury adequate guidance on the question of procuring cause. We conclude, therefore, that the trial court did not err in giving them.

Finally, Chelco contends that the trial court erred in permitting plaintiff to impeach his own testimony on direct examination. It is sufficient to note that we have examined the record relative to this point and find that if any error was committed, it was not prejudicial.

We next consider plaintiff's contention in his cross-appeal that the trial court erred in denying leave to amend his complaint by adding a count (count II). In this regard, section 46(1) of the Civil Practice Act (Ill. Rev. Stat. 1979, ch. 110, par. 46(1)) provides in relevant part:

"At any time before final judgment amendments may be allowed on just and reasonable terms, introducing any party who ought to have been joined as plaintiff or defendant, discontinuing as to any plaintiff or defendant, changing the cause of action or

defense or adding new causes of action or defenses, and in any matter, either of form or substance, in any process, pleading, bill of particulars or proceedings, which may enable the plaintiff to sustain the claim for which it was intended to be brought or the defendant to make a defense or assert a cross demand."

Although a party has no absolute right to amend pleadings (*Whildin v. Kovacs* (1980), 82 Ill. App. 3d 1015, 403 N.E.2d 694), section 46(1) is to be liberally applied to permit resolution of cases on their merits rather than on procedural technicalities (*Bloom v. Landy* (1979), 72 Ill. App. 3d 383, 389 N.E.2d 1286) and to enable a party to fully present his case (*Banks v. United Insurance Co. of America* (1975), 28 Ill. App. 3d 60, 328 N.E.2d 167). Motions to amend the pleadings are addressed to the sound discretion of the trial court (*First National Bank & Trust Co. v. Sousanes* (1978), 66 Ill. App. 3d 394, 384 N.E.2d 30), and the test for determining if such discretion was properly exercised is whether allowance of the amendment furthers the ends of justice (*Wallace v. Weinrich* (1980), 87 Ill. App. 3d 868, 409 N.E.2d 336; *Economy Fire & Casualty Co. v. Pearce* (1979), 79 Ill. App. 3d 559, 399 N.E.2d 151).

■■ Furthermore, while an amendment should not ordinarily be permitted if it sets forth matters of which the pleader had full knowledge at the time of filing the original pleading and no excuse is offered for not putting the substance of the amendment therein (*Mayfair Construction Co. v. Security Insurance Co.* (1977), 51 Ill. App. 3d 588, 366 N.E.2d 1020; *Mundt v. Ragnar Benson, Inc.* (1974), 18 Ill. App. 3d 758, 310 N.E.2d 633), such amendment will be allowed if justice is not served by denying leave to amend, all doubts being resolved in favor of allowing amendments (*Lawson v. Hill* (1979), 77 Ill. App. 3d 835, 396 N.E.2d 617). It is equally well established, however, that courts should not permit the amendment of pleadings if the other party would be prejudiced (*Mentesana v. La Franco* (1979), 73 Ill. App. 3d 204, 391 N.E.2d 416) or surprised thereby (*First National Bank & Trust Co. v. Sousanes* (1978), 66 Ill. App. 3d 394, 396, 384 N.E.2d 30, 31).

In the case before us, plaintiff filed his original complaint in September 1975 to recover a brokerage commission allegedly due him from Building Management and Chelco, and the record indicates that at an evidence deposition taken in May 1976, plaintiff stated that under his oral contract with defendants he was to be paid a salary, brokerage fees, and—upon becoming president of Building Management—a monthly management commission, and it was indicated in the deposition that he became president in January 1974.

Thereafter, on May 15, 1980, plaintiff moved for leave to amend the original complaint to add a claim for recovery of the monthly manage-

ment commission. No action was taken on that motion until the case was assigned to trial, at which time it was denied by the trial judge.

■■ It is our belief that the trial court should have allowed the amendment. The proof concerning the claim for such commission could apparently have been presented without delaying the case, and it is apparent that the management commission was one of the alleged terms of employment in the oral contract, so that the evidence presented by Chelco to refute the brokerage commission claim would have been essentially the same as that presented against the claim for the management commission. (See *United Air Lines, Inc. v. Conductron Corp.* (1979), 69 Ill. App. 3d 847, 387 N.E.2d 1272; *cf. Able v. Pure Oil Co.* (1972), 8 Ill. App. 3d 558, 290 N.E.2d 331 (trial court did not abuse discretion in denying leave to amend complaint where amendments were substantially included within issues already framed by pleadings).) Thus, Chelco would not have been prejudiced by the proposed amendment, nor would it have materially altered the nature and quality of the proof required to defend. (See *Blazina v. Blazina* (1976), 42 Ill. App. 3d 159, 356 N.E.2d 164.) Moreover, Chelco cannot claim surprise since the motion was presented about three weeks before the case was assigned to a trial judge. (See *Servbest Foods, Inc. v. Emessee Industries, Inc.* (1980), 82 Ill. App. 3d 662, 403 N.E.2d 1.) Although plaintiff had full knowledge of the matters set forth in the amendment and offered no excuse for failing to include the substance of the amendment in the original pleading, in view of the record before us we believe that justice was not served in denying leave to amend and that the trial court abused its discretion in so doing. We therefore reverse the order denying leave to amend, and this cause will be remanded for further proceedings in that regard.

Finally, we consider plaintiff's other contention on cross-appeal, that the trial court erred in denying him prejudgment interest, to which he argues entitlement under the provisions of section 2 of the Interest Act which allows prejudgment interest to creditors at the rate of 5 percent per year "on money due on the settlement of account from the day of liquidating accounts between the parties and ascertaining the balance * * * and on money withheld by an unreasonable and vexatious delay of payment." (Ill. Rev. Stat. 1979, ch. 74, par. 2.) We find this contention to be without merit.

■■ We need not determine whether the amount of interest due is capable of ascertainment, since we think it clear from the record before us that money was not withheld by Chelco because of an unreasonable and vexatious delay of payment. Neither an honest dispute regarding the existence of a legal obligation nor the defense of a lawsuit can be regarded as unreasonable and vexatious delays of payment. (*Edens View Realty &*

*Investment, Inc. v. Heritage Enterprises, Inc.* (1980), 87 Ill. App. 3d 480, 408 N.E.2d 1069; *Hamilton v. American Gage & Machine Corp.* (1976), 35 Ill. App. 3d 845, 342 N.E.2d 758; *Santucci Construction Co. v. County of Cook* (1974), 21 Ill. App. 3d 527, 315 N.E.2d 565.) Rather, the claimant must show that his opponent has thrown obstacles in the way of collection or has otherwise induced the creditor to delay collection proceedings (*Kespohl v. Northern Trust Co.* (1970), 131 Ill. App. 2d 188, 266 N.E.2d 371) or such claimant must establish conduct on the part of his opponent which is tantamount to fraud (*Hamilton v. American Gage & Machine Corp.*). Here, it is apparent that no action of Chelco, other than the defense of this suit, occasioned the delay in payment. Decisions concerning the award of prejudgment interest are questions of fact, and their determination will not be disturbed on review unless contrary to the manifest weight of the evidence. (*Hamilton v. American Gage & Machine Corp.*) Consistent with that standard, we cannot say the trial court's finding was incorrect.

For the reasons stated, the judgment entered on the verdict for plaintiff is affirmed; the order denying prejudgment interest to plaintiff is affirmed; the order denying plaintiff leave to amend his complaint is reversed and this cause is remanded for further proceedings in that regard.

Affirmed in part, reversed in part and remanded with instructions.

LORENZ and WILSON, JJ., concur.