**HARRY F. CHADDICK REALTY, INC.,**
a corporation, Plaintiff-Appellant,

v.

Geneva **MAISEL**, Leonard Schanfield and Jeffrey H. Miro, as Trustees of the Emanuel N. Maisel Trust, Defendants-Appellees.

Nos. 83–2653, 83–2695 and 84–1686.

United States Court of Appeals,
Seventh Circuit.

Argued Jan. 11, 1985.

Decided May 21, 1985.

As Amended May 21, 1985.

Kenneth W. Sullivan, Foran, Wiss & Schultz, Chicago, Ill., for plaintiff-appellant.

Philip C. Stahl, Reuben & Proctor, Chicago, Ill., for defendants-appellees.

Before CUDAHY and FLAUM, Circuit Judges, and PELL, Senior Circuit Judge.

CUDAHY, Circuit Judge.

Developer E.N. Maisel and Associates ("Maisel") hired Harry F. Chaddick Realty, Inc. ("Chaddick Realty") as leasing agent for a shopping center being developed on the northwest side of Chicago. Chaddick Realty has collected $800,000 in commissions under the agreement with Maisel. Chaddick Realty brought a federal diversity suit for some $1,250,000 in additional commissions under a bonus provision in the agreement. In a careful memorandum opinion and order the district court entered summary judgment for defendants. The district judge also denied defendants' later motion for fees and expenses under § 2–611 of the Illinois Code of Civil Procedure. Plaintiff now appeals from the grant of summary judgment, and defendants cross-appeal from the denial of the motion for fees. We affirm.

I.

On June 10, 1975, Chaddick Realty entered into a contract with Maisel Associates, developers of the Brickyard Shopping Center on the northwest side of Chicago, under which Chaddick Realty would, as leasing agent, have the exclusive right to lease certain space in the proposed mall. The contract contained a provision, ¶ 502, according to which Chaddick Realty was entitled to a bonus commission if a certain percentage of the store space subject to Chaddick Realty's exclusive right to lease had been leased by a certain date.

The paragraph in question reads in part as follows:

> In the event the cumulative average annual rental reserved in the leases for mall stores located on the second and third levels of the shopping center exceeds $10.50 per square foot per year of such space leased, Developer will give Agent as additional commission an amount equal to 15 cents per square foot for each 10 cents per square foot of rental received in excess of $10.50 per square foot average, *provided that 90% of said mall stores located on the second and third levels are leased by or before March 31, 1978.*

(Emphasis added.) Plaintiff now argues that it has satisfied the conditions of the paragraph and is entitled to the bonus; defendant denies the claim. The dispute centers on the meaning and effect of the word "leased" as it appears in the paragraph. Plaintiff claims to have "leased" 96 stores by March 31, 1978—well over 90%—but concedes that in 32 instances neither landlord nor tenant had actually signed a lease.

Defendants argued before the district court, and have argued here, that the contract is unambiguous so that the plain meaning of the word "lease" should govern, and that in ordinary parlance the word is so used that a lease is an enforceable contract. Since a lease is not ordinarily enforceable until signed by both parties, defendants' view not surprisingly would entail that plaintiff had not leased 90% of the property by the deadline.

The district judge agreed that in its ordinary meaning a lease is an enforceable contract, but went on to hold that the contract was not unambiguous in this respect. In her view, defendants' interpretation of "leased" could not be squared with paragraph 2.03, which specified that, in the event defendants lost control of the property, plaintiff could collect "commissions earned on leases theretofore executed by

developer." In her view, if commissions accrue "as a general rule when leases are 'executed by Developer,' the need for the quoted portion of ¶ 2.03 is not apparent." *Chaddick v. Maisel,* No. 79 C 1083, slip op. at 9 (N.D.Ill. Aug. 10, 1983). Because she believed paragraph 2.03 undermined defendants' interpretation of "leased" to some extent, and rendered it ambiguous, she found it necessary to compare paragraph 5.02 with other provisions of the contract, and to look into what the parties had to say about the intended meaning of the provision. In the end, she held that the provision was to be interpreted so that no property would be considered leased until at least the tenant had signed the lease. Under that interpretation of the provision plaintiff had not leased 90% of the properties by the deadline, and the judge granted summary judgment in favor of defendants.

Based on the district court's holding that the contract is ambiguous, plaintiff now argues that parol evidence raises an issue of fact as to how the word "leased" is to be understood. The evidence appealed to is intended to show that the parties' understanding of the word derived in part from an Illinois doctrine under which, if a broker produces a tenant who is ready, willing and able to lease on the landlord's terms, he has earned his commission; and that the parties intended the requirement of producing a ready, willing and able lessee to be satisfied when the defendants approved a prospective tenant's application. Under this reading, plaintiff argues, 90% of the properties would have been leased by the deadline.

## II.

■ It seems to us that the language of the contract is not ambiguous, and that "leased" is to be given its ordinary meaning, whether basic or bonus commissions are in question; that there is indeed an Illinois doctrine of the "ready, willing and able" lessee, as plaintiff argues, which can override the terms of the contract in the case of basic commissions; but that, in the absence of contrary indications, it would be

wrong to extend that policy to override contract provisions controlling bonus commissions.

### A.

We think that the district judge was wrong to think that the word "leased" was ambiguous in paragraph 5.02—although, as we shall see, that is not the end of the matter. Her determination of ambiguity was based on paragraph 2.03, which said that if defendants lose control of the shopping mall, plaintiff can collect "for commissions earned on leases theretofore executed by Developer." She reasoned that if payments were earned in general when leases were executed by the developer, the provision in paragraph 2.03 would be superfluous; a clause is necessary, presumably, only when it affects the rights of the parties in some way.

Although what the district judge says is true, we do not think that the provision shows that the word "lease" in the contract is ambiguous as between the meanings suggested by the plaintiff and the defendant. If anything, her argument could be used only to show that there might be yet a third meaning, something that neither party has argued and which does not seem a serious possibility. For as the district judge understands the provision, it would be superfluous on both the defendant's and the plaintiff's understanding of the word. If, as the defendant claims, a commission is due when defendant executes the lease, then it is unnecessary to have a clause to guarantee the commission on the executed leases when the defendant loses control of the development. But the same is true if, as the plaintiff claims, the commission is earned when the plaintiff has presented a tenant ready, willing and able; if plaintiff is entitled to his commission at that point, *a fortiori* he is entitled to it when the lease has been executed, and the provision is superfluous.

Since, on either account, the provision would become superfluous, and since neither party suggests a third meaning for the word "lease," the reasonable conclusion

to draw is that the paragraph is directed to other concerns than whether or not the plaintiff would be entitled to his commission. Examination of the contract suggests that, indeed, paragraph 2.03 was revised to provide for immediate payment of the outstanding commissions, should defendants lose control of the mall, and to guarantee payment from their successors for leases the successors signed.[1] Thus paragraph 2.03 cannot be inconsistent with the defendants' interpretation of "lease" unless it is also inconsistent with the plaintiff's interpretation; and since it is not reasonable to suppose that it is inconsistent with both, we reject this as a reason for considering the term ambiguous. The district court gave no other reason for thinking it ambiguous, and our perusal of the contract does not reveal any.

■ Where the words of a contract are not ambiguous, they are to be given their ordinary meaning, *Susmano v. Associated Internists of Chicago*, 97 Ill.App.3d 215, 52 Ill.Dec. 670, 422 N.E.2d 879, 882 (1981), unless reasons of policy dictate otherwise. The common meaning of the word "leased" entails, as the district judge found, that a lease is an enforceable contract. Webster's Third New International Dictionary defines the verb "to lease" thus:

> to grant or convey to another by lease ... to hold under a lease ... to be under lease ...,

and the noun "lease":

> a contract by which one conveys lands [etc.] ...; the act of such conveyance, the instrument by which it is made.

There is no hint of any meaning which would be consistent with a property's having been leased when no contract was in effect. *See Chemical Petroleum Exchange, Inc. v. Metropolitan Sanitary*

*Dist.*, 81 Ill.App.3d 1005, 37 Ill.Dec. 110, 401 N.E.2d 1203, 1206 (1980); BLACK'S LAW DICTIONARY. Hence, unless compelling considerations of policy apply, summary judgment for defendants is indeed appropriate.

### B.

There is, in fact, one sort of policy consideration that is relevant here. The Illinois doctrine of the "ready, willing and able" lessee, as we understand it, applies—regardless of the intent of the parties—to entitle a broker to his commission even though the contract calls for a lease, and no lease has been signed.

In *Arthur Rubloff & Co. v. Comco Corp.*, 63 Ill.App.3d 362, 20 Ill.Dec. 338, 380 N.E.2d 15 (1978), defendant agreed to pay plaintiff a commission upon the leasing of a certain property. The agreement contained the following clause:

> This agreement shall become null and void if a lease is not signed within ninety days from the date of this letter by [the prospective tenant.]

Although the proposed tenant was in the process of negotiating a lease, the ninety days elapsed without any lease being signed. Plaintiff Rubloff sued when defendant declined to pay a commission. The trial court held that "lease," as used in the agreement, was ambiguous; that if the parties had intended for a lease contract to be signed by both tenant and landlord, they would have included such language in the agreement; and that the tenant's signature on a preliminary lease for another property satisfied the conditions for the commission.

The Illinois Appellate Court affirmed summary judgment for the plaintiff, under what it called the "procuring broker" approach:

> this agreement in respect to any leases that are executed within a six (6) month period of the termination date by the Developer or any subsequent owner with tenants with whom the Agent has negotiated and of which the Developer has had knowledge pursuant to reports furnished as provided for in Section 3.07 of this agreement.

---

1. 2.03. This agreement shall terminate upon the termination of the Developer's control of the premises known as the Brickyard, provided, however, that upon such termination, the Agent shall be entitled to full payment for commissions earned on leases theretofore executed by Developer and provided further that the Developer shall pay all costs to be paid to the Agent, the commissions provided for in

[I]t is the policy of the law to protect a broker who has been employed or authorized to act and who, in good faith, has so acted. Additionally, ... where the owner accepts the services of the broker and continues, without interruption, to negotiate with the lessee produced by the broker, and finally concludes a lease with the same lessee, even though the lease is not formally signed by the lessor and lessee within the time set forth in the memorandum, the lessor should not escape the payment of a commission.

*Id.,* 20 Ill.Dec. at 343, 380 N.E.2d at 20. The Court cited *Griswold v. Pierce,* 86 Ill.App. 406 (1899), as the leading Illinois case on the issue.

As we understand the policy underlying the "ready, willing and able" approach, it depends largely on the fact that successful conclusion of negotiations is within the control of the landlord, who can prevent the terms of the lease from being determined during the allotted time limit by simply refusing to agree. Under such circumstances, the landlord can generally even prevent the prospective tenant from signing a lease before the deadline. In order to keep a commission agreement from being illusory, therefore, the law will see to it that—whatever the literal wording of the agreement—the broker has earned his commission if he has presented a ready, willing and able tenant. *Rubloff* shows that this is something that the defendant cannot contract out of simply by drawing up an agreement that requires that a "lease" be signed within the allotted period. Evidently the policy is a formidable one. But see *Brinkoetter & Co. v. Cresthaven Country Club, Inc.,* 118 Ill.App.3d 554, 73 Ill.Dec. 933, 454 N.E.2d 1182, 1185–86 (Ill.App. 1983), holding that the parties may by specific provisions determine how the policy is to apply.

The question, therefore, is whether the policy applies to provisions like the one in question, in which a bonus commission is provided for; for if it does, it overrides the ordinary meaning of "leased," and summary judgment may indeed have been inappropriate.[2]

We must ask, that is, whether a *bonus* commission depending on property's being leased by a certain date may be earned even if the property has not been formally leased by that date. The policies implicated by the bonus commission are not the same as those implicated by a regular commission agreement. The normal commission agreement is usually limited in time; often it is for a period of thirty, sixty or ninety days. This limitation has more to do, ordinarily, with the relationship between landlord and broker than it does with the urgency of the leasing. The landlord intends—where the agreement is an exclusive one—that the broker concern himself with the leasing. One way to insure the broker's concern is to see to it that there is a limit to the period during which the broker has the exclusive right to rent the property. If the broker does not provide a lessee in the allotted time, he will lose his chance to do so. The expiration date is a more or less arbitrary limitation which serves the function in an exclusive agreement that competition serves in a non-exclusive agreement.

A corollary of this proposition, however, is that the broker who does actively concern himself with the rental of the property, and who does provide a lessee within the time period, should not be at the mercy of the landlord for his commission. The *reason* for the deadline, in such a case, does not conflict with a policy allowing a commission even if the lease is not signed.[3] Naturally, if the contract makes evident that the time of expiration of the contract is not arbitrary, but is chosen with a defi-

**2.** We reach no conclusions about whether the "ready, willing and able" doctrine applies to the basic commissions in this case, since they are not in dispute.

**3.** The policy also protects brokers when landlords change their minds and refuse to rent to the tenants provided; but we are concerned here only with the case in which negotiations put off the signing until after the deadline.

nite purpose in mind, the policy will have no application. Where a contrary purpose is not stated, however, the policy creates a presumption in favor of the broker.

■ But the same considerations do not apply to a bonus deadline. Where a bonus has been promised for property leased by a certain date, the broker does not lose his exclusive agreement if the property is not leased by that date. It cannot be presumed that the deadline is arbitrary, and it follows that we cannot rely on the "ready, willing and able" cases to interpret such a bonus clause.[4] If the policy behind that doctrine

**4.** The defendants argue that other provisions of this same agreement support their view that no commission was due until a lease was signed by both landlord and tenant. Defendant points to ¶ 4.02 of the contract, which allowed for a commission if Maisel Associates failed for 45 days to act on a tendered form of lease signed by a tenant. This provision, they argued (and the district judge agreed), would be superfluous if a commission could be earned before a lease is actually signed. This argument construes plaintiff's position to be that a broker has earned his commission *at the time* he provides a ready, willing and able lessee. That is not what we understand plaintiff to be arguing, and it is a misinterpretation of the "procuring broker" doctrine. No one has ever argued that under that doctrine a broker's commission comes due as soon as he has provided a suitable lessee. We understand the doctrine to say that, whatever the due date for a commission, the lessor cannot decline to pay it just because negotiations with the lessee have not come to fruition within the period of the brokerage contract.

¶ 4.02 tightens up this common law doctrine; even should the 45-day period end during the period of the brokerage contract, a commission will have been earned. It does not displace the doctrine; should the brokerage contract end before 45 days after a lease has been signed by the lessee (in the case of some particular lease), and thus before a commission had been earned under the explicit terms of the contract, the procuring broker doctrine would presumably take over to sustain the broker's right to his commission. At that time the question would be simply whether the broker had provided a lessee ready, willing and able. (Under Illinois law the fact that the lessee provided by the broker ultimately signed with the lessor provides the broker with a presumption that the lessee was ready, willing and able. *Pietka v. Chelco Corp.*, 107 Ill.App.3d 544, 63 Ill.Dec. 223, 437 N.E.2d 872, 877 (1982)). Thus, we are not at all convinced that Illinois courts would find that ¶ 4.02 defeated a "ready, willing and able" claim in the normal case. In any event, however, we find this argument irrelevant, as we have said, because it presupposes one of the very points at issue: that the bonus provision is affected by the doctrine in the same way the basic commission provisions are affected.

The same thing is true of other arguments from other provisions of the lease. Defendant argues from another provision that makes the amount of a particular commission depend on the number of square feet referred to in the lease in question. Yet the *Rubloff* case involves this very point; although it is difficult to see how the commission would be determined if the lessor in that case had never signed the lease, where the parties *did* sign, but after the deadline in the broker's agreement, the amount of the commission depended on the later lease (proving again that the "procuring broker" doctrine is not about the time at which the commission accrues).

Finally, defendant points to evidence from depositions that plaintiffs themselves understood the "leasing" on which the bonus commissions depended to require that at least the lessee had signed. During the course of his depositions, plaintiff's president, Harry F. Chaddick, offered the following testimony:

Q. Was it your understanding that the developer—I'm going back now to June 10, 1975, when you signed the contract—was it your understanding that the developer might owe the Harry F. Chaddick Realty Company a basic commission even though a lease hadn't been fully executed by both the tenant and the developer?

A. I think it was. There were so many changes made in the procedure that really affected this particular provision.

I think it was our intent that we would be entitled to the commission if the Maisel people had approved the tenant and the business conditions, whether they formally executed that lease or not. In other words, we already had completed all our work.

Q. On June 10, 1975, when you signed this contract, did you understand that in order for the Harry F. Chaddick Realty Company to earn a commission, that at least the tenant would have had to sign the lease?

A. Yes.

Q. Does that apply to both the bonus commission and the basic commission?

A. Yes, sir.

Q. So then unless the tenant signed the lease you wouldn't be entitled to no [sic] commission?

A. I don't think we would.

Chaddick Deposition at 177–78. The district court described these answers as "fatal admissions." Although having found the contract unambiguous we need not address this evidence, we note that Chaddick's remarks seem less clearly fatal to us although they lend some support to the result we reach. Chaddick first said that "basic" commissions (though it was not

does not apply, we see no reason not to give the terms of the contract their ordinary meaning.

 Further, we think an argument may be made that it is even more imperative than usual, in a bonus provision with an explicit date, that words be given their literal meaning. We find an analogy in the "time is of the essence" clause. The approach of Illinois courts toward such clauses is set out at some length in *Dikeman v. Sunday Creek Coal Co.*, 184 Ill. 546, 56 N.E. 864, 865 (Ill.1900):

> In a court of law the time for performance of an act is as essential as any other part of the contract.... Equity maintains a somewhat different rule,—that time is not necessarily of the essence of a contract; and if it is not of the essence of an agreement, and a party has acted in good faith in a meritorious cause, equity may grant relief. Parties have a right, however, to make their own contracts, and if they intend that time shall be of the essence of the contract, either by the express form of their agreement or because the subject-matter makes it so, a court of equity will treat it as of the essence, and hold the parties to their agreement. A court of equity is bound by

a contract as the parties have made it, and has no authority to substitute for it another and different agreement, and particular language is not necessary to make the time of performance essential, if right and justice in the individual case demand it. An agreement must be complied with as made unless some stipulation is waived, or there is a just excuse for noncompliance.

*See Hart v. Lyons*, 106 Ill.App.3d 803, 62 Ill.Dec. 697, 436 N.E.2d 723, 725–26 (Ill. App.1982).[5] We have already discussed the function of the time limits ordinarily placed on brokerage contracts; such limits have more to do with the control the lessor means to retain than with the urgency of selling within a certain time period. The importance of these factors is reversed in the case of bonus commissions; should the time for the bonus run out, the lessor does not regain control of leasing from the broker, who continues under his exclusive agreement but without the bonus. The reason for the time limit, therefore, must be something of independent importance; the fact that the landlord, whose agreement with the broker is already subject to an expiration date, thought another date sufficiently important to attach a bonus to

---

clear that this was a term of art) were due whether they (Maisel and the tenant) had formally executed the lease or not: "In other words, [when] we already had completed all our work." He then said that neither the "bonus" nor the "basic" commission was due unless at least the tenant had signed the lease. The words of the plaintiff's president are not unarguably clear, and taking the testimony in the light most favorable to the plaintiff, as we must in this review of summary judgment, we would be unwilling to treat these remarks as fully dispositive.

5. The time fixed for performance, is, at law, deemed of the essence of the contract. And if the seller be not ready and able to perform his part of the agreement, on that day, the purchaser may elect to consider the contract at an end. In Sugden's Law of Vendors 275, it is said, 'The general opinion has always been, that the day fixed was imperative on the parties, at law. This was so laid down by Lord Kenyon, and has never been doubted in practice. The contrary rule would lead to endless difficulties, if, in every case, it must be referred to a jury to consider, whether the act

was done within a reasonable time; and the precise contract of the parties would be avoided, in order to introduce an uncertain rule, which would lead to endless litigation. But equity, which from its peculiar jurisdiction, is enabled to examine into the cause of delay in completing a purchase, and to ascertain how far the day named was deemed material by the parties, will, in certain cases, carry the agreement into execution, although the time appointed has elapsed.' But he justly adds, perhaps, there is cause to regret, that even equity assumed this power of dispensing with the literal performance of contracts, in cases like those.

*Bank of Columbia v. Hagner*, 1 Pet. 455, 464, 26 U.S. 454, 464, 7 L.Ed. 219 (1828). *Compare* WILLISTON ON CONTRACTS § 846: "It is only when this question [whether time is of the essence] has been decided in the negative that any rule of law other than one of interpretation is called into play." Although Illinois has answered that question in the negative for many sorts of ordinary commission, the same reasons of policy do not entail extending the answer to bonus commissions.

it must prevent us from creating a presumption that the date chosen is more or less arbitrary. Unless there are circumstances, then, which argue to the contrary, we should interpret time limits in bonus provisions strictly and not read into them any special protections for the broker based on general considerations governing exclusive contracts.

■ Although interpreting "lease" strictly in ¶ 5.02 would seem to place undue power in the hands of the lessor, we will assume that the parties have been careful in drafting to express their intentions. Naturally we require that the parties act in good faith, RESTATEMENT (SECOND) OF AGENCY § 446 (1958), but here there is no suggestion that either side has acted otherwise than in good faith. We hold that where bonus commissions are subject to a time limit, the conditions to which the provisions are subject need not be read in the light of any special needs of brokers for protection; and that, therefore, the word "leased" in ¶ 5.02 of the contract between Chaddick and Maisel need not be interpreted in keeping with the practice among real estate brokers, or as implicating the Illinois doctrine of "procuring broker," but should be given its ordinary and plain meaning. A bonus which depends on property being "leased" by a certain date, therefore, depends upon the lease being signed by tenant and landlord.

Although this outcome may seem harsh, the alternative is even harsher. The developer who is willing to pay a bonus for leases secured by a certain time usually has deadlines of his own to meet, whether for financing, or other rentals, or for similar reasons. The bonus he offers is something he is willing to pay to have the broker expend effort in his favor, but only if the leasing is accomplished by a certain date. If it is not done by that date, it is of little concern whether it is due to the broker's fault or to an act of God. The developer will be less likely to meet his own deadlines, and less likely to be able to pay the bonus. As regards bonus provisions, therefore, we conclude that Illinois law provides no special protection to brokers, and that the parties who draft and agree to these provisions must take care to protect their own interests.[6]

### III.

■ Plaintiff argues, under Count II of the complaint, that the bonus deadline should not be construed to mean a particular date but rather to indicate a length of time. That is, since the length of time from the signing of the contract until the bonus date was something over two years, plaintiff argues that the contract means that it should have that length of time—something over two years—from the time leasing actually became feasible to fulfill its quota. Since the rental of the smaller stores depended on certain "anchor" stores having already been rented, and since the anchor stores were not leased until May 1977, plaintiff therefore contends that it should have had more than two years from May 1977 to earn its bonus commission. The district court found this contention to be baseless and without merit: "A term more unambiguous than 'March 31, 1978' is hard to conceive." We agree. Both parties clearly understood that the rental of the anchor store spaces would take a certain amount of time, and both parties understood that a transition from temporary to more favorable permanent financing was desirable, but could only take place when a certain percentage of properties had been leased, and that that was a reason for setting the firm deadline.

### IV.

On cross appeal, defendants argue that plaintiff's allegations were untrue and made without reasonable cause, and that

---

**6.** The district court found that of 96 stores the plaintiff claimed to have "leased" by March 31, 1978, in 52 cases leases had been signed by both tenant and landlord; in 12 cases by the tenant but not the landlord; and in 32, the defendants had only approved an application form and financial data submitted by the tenants.

under either federal law or Illinois law they are entitled to the award of attorneys' fees.

Far from being frivolous, plaintiff's first count presented some very difficult problems indeed, and the award of fees therefore would be inappropriate. For these reasons, we affirm the judgment of the district court.