BRUCE BOSSOW, d/b/a ERA Bruce Realty, Plaintiff-Appellee, v. BOWLWAY LANES, INC., *et al.,* Defendants (Bowlway Lanes, Inc., Defendant-Appellant).

Second District No. 2—87—0089

Opinion filed October 15, 1987.

Robert S. Kramer, of Ariano, Anderson, Bazos, Hardy, Kramer & Castillo, of Elgin, for appellant.

Kevin M. McCarty, of McCuaig, Haeger, Bolz & McCarty, of West Dundee, for appellee.

JUSTICE REINHARD delivered the opinion of the court:

Defendant, Bowlway Lanes, Inc., appeals from a judgment following a bench trial for plaintiff, Bruce Bossow, d/b/a ERA Bruce Realty, in the amount of $27,500, constituting a broker's commission allegedly due from the sale of a bowling alley. Defendant raises the following issues on appeal: (1) whether the trial court erred in finding that plaintiff was the procuring cause of the sale and (2) whether the trial court's finding of an enforceable open listing agreement between

plaintiff and defendant was against the manifest weight of the evidence.

Plaintiff commenced this action against Bowlway Lanes, Inc. (Bowlway), Richard Boras, Lou Psaltis, William Grocke, and Norman Grocke. Bruce Bossow is a real estate broker and president of the firm doing business as ERA Bruce Realty. Defendants William and Norman Grocke are the present owners of Bowlway Lanes Enterprises, Inc., located in Elgin, Illinois. Defendants Richard Boras and Lou Psaltis are the former owners of Bowlway, before its sale to the Grockes, when it was known as Bowlway Lanes, Inc.

Following the close of plaintiff's case, the trial court dismissed the counts of the complaint against Boras, Psaltis, and William and Norman Grocke on their motions for a finding in their favor. Defendant offered no further evidence, and the trial court found that plaintiff's broker was the procuring cause of the sale of Bowlway's assets, that the purchase price of those assets, exclusive of the real estate, was $275,000, and that plaintiff and defendant had acknowledged a 10% commission. Accordingly, the trial court held for plaintiff and awarded a judgment of $27,500.

The trial testimony discloses that, in January 1983, Bruce Bossow was introduced to Richard Boras by Julius "Tubby" Simonini, a mutual friend and real estate broker. The three of them had a conversation regarding the possible sale of Bowlway, which consisted of the business assets only, as the real estate was owned by another person. Boras indicated that he was not actively seeking a buyer, but that "anything is for sale." Boras also stated that he felt his business was worth $550,000 and Bossow explained that the selling price would have to be $650,000 to include his usual 10% commission and an amount for "haggling." Boras said that he was concerned about exposure to the public and did not want a multiple listing agreement. Bossow agreed that he or Simonini would accompany any showing. Bossow stated that an open listing agreement was discussed and decided upon. However, no written listing agreement was executed. He believed the open listing agreement was for an indefinite period of time until terminated by defendant. They decided upon what business assets would be included in the sale. Boras testified that he recalled meeting Bossow, but the conversation was just "chitchat." He admitted telling Bossow that if anyone could come up with $550,000 net to him, he would entertain selling the business. Thereafter, Bossow mentioned Bowlway to a number of prospective buyers. Later, Boras sent plaintiff an appraisal on the building and the assets which he had obtained.

During March 1983, one of plaintiff's brokers, Georgia Darehshori,

showed Bowlway to Ken Krischke on two separate occasions. Neither showing resulted in an offer or any negotiations. In the meantime, Darehshori received a telephone call from the Grockes regarding their interest in purchasing a bowling alley in response to plaintiff's newspaper advertisement. The Grockes, Darehshori, Psaltis, and Simonini had a meeting at Bowlway in March 1983. The Grockes expressed an interest in the business. A similar second showing ensued a few days later. The Grockes discussed the possibility of an appraisal and said that they were interested in buying the real estate as well as the business. Darehshori testified that she sent them a copy of the appraisal which she had previously received from Boras. Subsequently, Darehshori sent a letter to Boras on March 18, 1983, relaying what had happened to date. Afterwards, in early April, the Grockes indicated that they were not interested. The Grockes wanted to purchase the real estate as well as the business, but felt that $650,000 was too much to ask for the business. They never requested any financial data concerning Bowlway or made any offer to purchase because they wanted to purchase the real estate and the business. Darehshori contacted the Grockes on several later occasions in May about their possible interest in other bowling alleys. This was her last contact with them.

The Grockes proceeded to look at other bowling alleys throughout the country. In the meantime, the bowling alley was remodeled by defendant, costing approximately $7,500. In July 1983, Boras contacted William Grocke to determine if the Grockes had a continued interest in Bowlway. The Grockes, Boras, and Psaltis met on three or four occasions following this telephone call. Boras agreed to contact the owner of the real estate about the possibility of its sale as well. The owner, Mrs. Harris, was contacted by Boras, and she indicated that she might sell the building and land. An appraisal of the property was obtained, and negotiations began between the Grockes and defendant, who also was discussing the matter with Mrs. Harris. In September 1983, the Grockes' $600,000 offer for the real estate and assets was rejected. No further negotiations took place until December 1983. In the meantime, the Grockes were actively looking at other bowling alleys through another broker. In December 1983, Boras called and offered to sell the business and the real estate for $608,000. This was accepted by the Grockes. The business was sold for $275,000 and the land and building for $333,000. The original appraisal for the real estate was $273,000, but Mrs. Harris wanted more, and defendant agreed to allocate more to her in order to close the entire transaction. She also intimated that she might not renew defendant's lease or agree to an assignment of the lease. Neither plaintiff nor Darehshori

was involved in these negotiations.

Defendant contends on appeal that the findings of the trial court that there was an enforceable oral open listing agreement between the parties and that plaintiff was the procuring cause of the sale of defendant's business were against the manifest weight of the evidence and contrary to law.

■ We address first the issue of whether the evidence establishes that there was an enforceable oral open listing agreement between the parties. An open listing agreement is one where the broker is employed to bring about whatever transaction the seller has contemplated, but there is nothing in the agency relationship which precludes the principal from bringing about the same transaction himself or from hiring other brokers to do so. (*Lord v. Melton* (1980), 80 Ill. App. 3d 1057, 1058, 400 N.E.2d 547.) By reason of an open listing there is not an exclusive right of one broker to sell the property. (80 Ill. App. 3d 1057, 1058, 400 N.E.2d 547.) Under this type of arrangement, a broker accepts the offer to contract by the performance of securing a buyer who is ready, willing, and able to buy the property at the terms desired by the sellers. (80 Ill. App. 3d 1057, 1060, 400 N.E.2d 547.) The brokerage contract may be oral and is governed by the law applicable to ordinary contracts. (*Hajeck v. Wyrick* (1984), 124 Ill. App. 3d 210, 215, 463 N.E.2d 1348; *Bau v. Sobut* (1977), 50 Ill. App. 3d 732, 737, 365 N.E.2d 724.) The parties' minds must meet through offer and acceptance, and the contract must be definite in its terms. (50 Ill. App. 3d 732, 737, 365 N.E.2d 724.) The listing agreement is the contract which creates and defines the scope of the broker's authority to act on behalf of the seller. *Hajeck v. Wyrick* (1984), 124 Ill. App. 3d 210, 215, 463 N.E.2d 1348.

Accepting Bossow's version of the January 1983 conversation regarding the open listing agreement, the only definite terms of the agreement are that (1) defendant's selling price was $550,000 net to him, (2) Bossow stated his commission would be 10%, which would raise the selling price to $650,000, and (3) only the business was being sold, as the real estate belonged to another person. There were no terms usually found in a listing agreement, such as the terms of the sale, *i.e.*, whether in cash or on contract, whether there was to be a down payment, and whether there were any contingencies; the period of the listing agreement; and any protection period for the broker when the listing expired for potential buyers he secured.

■ Even assuming that the few terms agreed upon established an open listing agreement, it is clearly evident from the record that plaintiff did not procure a purchaser ready, able, and willing to buy on those

terms. Generally, a real estate broker is entitled to a commission if he procures a prospective purchaser who is ready, willing, and able to buy on terms acceptable to the seller or if the sale was procured through his efforts, regardless of whether the owner made the sale himself or through another broker. (*Lyons v. Shane* (1985), 133 Ill. App. 3d 820, 824, 479 N.E.2d 456; *Herb Fox, Ltd., Realtors v. Stewart* (1980), 91 Ill. App. 3d 201, 203, 414 N.E.2d 881.) Here, however, the Grockes, although first procured by plaintiff, were unwilling to meet the terms of the listing agreement, as they were neither willing to pay $550,000 net to defendant for the business nor willing to buy the business without the real estate.

The evidence establishes that the negotiations for the sale of the business at the $550,000 net price together with a 10% commission to plaintiff ended in April or May 1983. Thereafter, defendant made improvements to the building and in July 1983 contacted the Grockes to determine if they were still interested in the business. The Grockes reiterated their interest in the business, but only if the real estate was sold too. Defendant then contacted the owner of the property for the first time regarding the sale of the land. Ultimately, through negotiation between defendant and the Grockes lasting from September to December 1983, an agreement was reached to sell both the business and the real estate, a transaction entirely different in subject matter and price from the original discussion with plaintiff that led to the arguably valid open listing agreement. It is apparent that defendant even agreed to take less from the sale in order to secure Mrs. Harris' agreement to sell the real estate at more than it was appraised.

Thus, the transaction finalized in December 1983 was significantly different in terms of subject matter and price from that in the open listing agreement between plaintiff and defendant discussed in January 1983. (*Cf. Tom Brinkoetter & Co. v. Cresthaven Country Club, Inc.* (1983), 118 Ill. App. 3d 554, 559, 454 N.E.2d 1182.) Accordingly, plaintiff has not procured a ready, willing, and able purchaser in accordance with the terms of the open listing agreement. Plaintiff has not met the terms of its contract and is not, therefore, entitled to a commission.

For the foregoing reasons, the judgment for plaintiff is against the manifest weight of the evidence and is reversed.

Reversed.

LINDBERG, P.J., and UNVERZAGT, J., concur.