*In re* ESTATE OF ADELLA VALLERIUS, Deceased (Don A. Balsters, Intervening Petitioner-Appellant, v. Alton Banking and Trust Company, Adm'r, Respondent-Appellee).

Fifth District   No. 5—92—0594

Opinion filed December 15, 1993.

Edward T. McCarthy, of Edwardsville, for appellant.

John W. Hoefert, Sr., of Alton, for appellee.

McGrady & McGrady, of Gillespie, for Peter Vallerius, Glenna F. Giacolletto, Lawrence Joe Davis, and Ione V. Henry.

PRESIDING JUSTICE LEWIS delivered the opinion of the court:

Petitioner appeals from the denial by the trial court of his petition for a real estate broker's commission. Petitioner argues on appeal that he is entitled to a real estate commission either under an oral contract or under the theory of *quantum meruit* for procuring a buyer of a motel sold at auction by the estate. We reverse the ruling of the trial court.

The assets in the estate of Adella Vallerius included the Innkeeper Motel and Restaurant located in Hamel, Illinois. The trial court ordered this property to be sold at an auction to be held on October 16, 1991. Homer Henke of Homer Henke Auction Service (Henke) was hired by the administrator, the Alton Banking and Trust Company, to conduct the auction, but there is nothing in the record that sets forth what his agreement was with the administrator. Henke sent out letters on September 21, 1992, to local realtors offering a 3% cooperative commission if the licensed real estate broker produced the successful bidder at the auction and if the offer was accepted by the probate court. (The record filed in this cause does not contain the order of the court permitting the sale of the commercial property and the conditions of the sale.) The letters set a cut-off date of 1 p.m., October 15, 1991, for the realtor to contact Henke for the purpose of submitting a buyer at the auction the next day in order to be eligible for the cooperative commission. Petitioner did not appear at the auction or submit a name of a buyer on October 15, 1991. The highest bid at the auction was $111,000.

Petitioner heard rumors that the bid of $111,000 would not satisfy the court as being an adequate price for the motel. A friend told the petitioner that John Brooks might be interested in the property. Petitioner then called Pat Heitzig, a trust officer for the administrator, to see if there was a possibility of earning a commission if he could locate a buyer for the property. Heitzig advised petitioner that the offer at the auction was probably not going to be accepted by the court and that a higher bid was going to be submitted to the court via a sealed bid. Heitzig further advised petitioner, according to the petitioner's testimony, which was not denied by Heitzig, that he could submit a sealed bid and that "there would be a commission," if petitioner

"made sure that [petitioner's bid] came in high enough to cover a commission." Heitzig indicated that the bid had to be in the range of $150,000 to $160,000. Heitzig testified concerning what he told the petitioner: "[H]e ought to be entitled to a commission for his efforts in securing a successful bidder. However, it would be up to the Court to determine that."

Petitioner then contacted John Brooks and found out that he was interested in buying the motel. Once petitioner had a potential buyer, he called Heitzig back to obtain the keys to look at the motel. Heitzig referred petitioner to Henke, but petitioner was unsuccessful in obtaining the keys. However, petitioner followed up his discussion with Henke by hand delivering a notarized letter to Henke, after Henke suggested he submit such a letter. The letter stated in full as follows:

"This letter is in reference to the Innkeeper Motel and Restaurant in Hamel, Illinois. I would like to introduce my client John Brooks who is interested in the purchase of this property. I would welcome any pertinent information regarding this matter."

Petitioner admitted that Henke never promised him a commission from the sale. Henke testified, "I had told him [petitioner] at that time that I would hope that he would get something, and I said 'If you would get twelve hundred and fifty, fifteen hundred dollars out of it, how would you feel about it?' "

The prior sale was disapproved on November 12, 1991, and the court proceeded with the second sale. Since there were several bidders present, the court decided to hold an auction in open court. Apparently, it soon became a bidding contest between Brooks and another buyer named Patell. Patell ultimately bid $153,000. Petitioner then told Brooks, "You are not going to let this opportunity pass you up for two hundred fifty bucks?" Brooks then made the successful bid of $153,250.

There is no dispute that petitioner was instrumental in bringing Brooks to the sale. According to Henke, the bidding started at $125,000 or $130,000 and went up from there with only Brooks and Patell bidding against each other. Patell would have been the successful bidder at the starting bid except for Brooks. The fact that petitioner was the procuring cause of Brooks being at the auction resulted in the estate selling the property for $28,250 to $23,250 more than the estate would have received. (The increase in price may have been even greater as the trial judge had not disapproved the prior sale for $111,000 before the petitioner entered the picture, and no one knows the amount of the sealed bid that the administrator and the

court would have accepted.) The trial judge, Heitzig, Henke, and the attorney for the estate all realized and believed that the petitioner should have received some compensation for his efforts, as he was responsible for driving the price up on the property to the benefit of the estate.

When the administrator's attorney attempted to cross-examine petitioner about the actual time he spent on the sale, petitioner's counsel objected on the grounds of relevancy and the trial court sustained the objection as there was no claim for *quantum meruit*. A discussion ensued between the court and counsel for the estate about the petitioner not claiming *quantum meruit*. Petitioner's counsel only said, "Our petition stands on its own." While the petition for commission does not specifically make any claim for *quantum meruit*, it alleges that the auction sale offered a 3% cooperative commission, that the court held more than one sale, that petitioner brought the highest bidder, and that "[p]etitioner herein does present his claim to this court for contribution to be made to him from the estate funds for a cooperative commission in the amount of $4597.50." The trial judge once again sustained the objection on the grounds of relevancy as to the cross-examination as to petitioner's time spent on the sale.

In the closing arguments, the attorney for the estate stated that he would not have any objection to the petitioner amending his petition so as to claim *quantum meruit* as long as they would have the opportunity to cross-examine petitioner about the time he had spent on the sale. Petitioner made no effort to accept counsel's offer.

The trial judge found that petitioner admitted that he performed all of his work after the October 15 deadline and regrettably denied the petition for a commission. There was no explanation by the trial judge as to why he felt that the October 15 deadline prevented the finding of an oral contract, ratification of the prior offer, or *quantum meruit* for the work that petitioner performed after the deadline. The judge suggested that petitioner should have "negotiated some agreement for commission and confirmed any such agreement in writing prior to the Court's auction." The written order reflecting the trial judge's ruling does not set out any reasons or the grounds for the denial of the petition. It is apparent, however, that the trial judge did not believe that the petitioner proved that there existed an express or implied contract binding the estate to pay a commission to petitioner.

Petitioner's argument in his brief raises the issue of whether petitioner should receive a commission under the theory of *quantum meruit*. The brief for the estate responded that the claim for *quantum meruit* was waived. Issues not presented and argued in the trial court

are waived on appeal. (*Greer v. Illinois Housing Development Authority* (1988), 122 Ill. 2d 462, 509, 524 N.E.2d 561, 582.) As a general rule, the theory upon which a case was tried in the lower court cannot be changed on review, and an issue not presented or considered by the trial court cannot be raised for the first time on review. (*Yates v. Doctor's Associates, Inc.* (1990), 193 Ill. App. 3d 431, 442, 549 N.E.2d 1010, 1017.) This case may be an exception to the general rule, as we will discuss later.

On first impression, this case appeared to involve a claim of *quantum meruit*, if anything. The parties did not present any briefs or cite any authority to the trial judge, and he ruled according to his impression of the law. Petitioner now cites case law in his appellate brief as to the existence of an oral contract and the right for *quantum meruit*, which is not rebutted by the respondents except to say that there was no express contract because no contract could have been formed after the first auction, citing no authority, and that petitioner has waived a *quantum meruit* argument. The administrator further argued that the only additional value received by the estate was $250, because Patell would have won the bid at $153,000 and the estate was under no obligation to pay him a commission.

■ We must review the law as it applies to real estate brokers, as the law is different than one might expect. First, there is no requirement that the contract employing real estate brokers must be in writing. (*Real Estate Buyer's Agents, Inc. v. Foster* (1992), 234 Ill. App. 3d 257, 600 N.E.2d 83.) While we may agree with the trial judge's suggestion that it would have been the better practice to have reduced the agreement to writing, it is not required since the contract of employment is not a contract for the sale of real estate that is required to be in writing by the Statute of Frauds. (Ill. Rev. Stat. 1991, ch. 59, par. 2.) A brokerage contract may be oral and is governed by the law applicable to ordinary contracts. (*Bossow v. Bowlway Lanes, Inc.* (1987), 161 Ill. App. 3d 983, 514 N.E.2d 809.) Moreover, a claim for a brokerage commission need not be based upon a written instrument. (*Edens View Realty & Investment, Inc. v. Heritage Enterprises, Inc.* (1980), 87 Ill. App. 3d 480, 487, 408 N.E.2d 1069, 1075.) "It is the policy of the law to protect a broker who has been employed or authorized to act and who, in good faith, has so acted." *Edens View Realty*, 87 Ill. App. 3d at 487, 408 N.E.2d at 1075.

■ The first issue is whether there was a contract of employment of petitioner by the administrator. The employment relationship may be formed by written instrument, orally, or by implication from the conduct of the parties. (*Arthur Rubloff & Co. v. Drovers National*

*Bank* (1980), 80 Ill. App. 3d 867, 400 N.E.2d 614.) "An implied contract is said to exist in a situation where the owner knows that the broker is endeavoring to effect a sale and expects to receive compensation for his services, and where the owner encourages the broker to aid in the sale and leads the broker to believe that he would receive compensation." *Arthur Rubloff & Co.*, 80 Ill. App. 3d at 873, 400 N.E.2d at 619.

The first offer was made by Henke and the agent for the estate, Heitzig, when they offered to pay any broker producing a successful buyer at an auction to be held October 16 3% of the sale price, provided the broker registered and made known to Henke by October 15 that the broker procured the buyer. We presume that the purpose of the preregistration of a specific buyer by a broker was to prevent a broker from claiming a commission when the broker had not procured that buyer. It is true that this offer was not accepted by petitioner within the time frame set by Henke, but we cannot disregard the fact, in examining the later acts and the relationship between the parties, that an offer had been made. The fact that an offer expires does not mean that the principal may not become liable to compensate the broker for his unauthorized acts by subsequent ratification of the broker's acts. (*Arthur Rubloff & Co. v. Drovers National Bank* (1980), 80 Ill. App. 3d 867, 400 N.E.2d 614.) The party seeking ratification must allege and prove that the alleged principal had timely knowledge that the broker participated in the transaction and acted for him and that the principal has done some act or has made a declaration, whether expressed or implied, which indicates his acceptance of the broker as his agent. *Arthur Rubloff & Co. v. Drovers National Bank* (1980), 80 Ill. App. 3d 867, 400 N.E.2d 614.

In the case at bar, contrary to the facts in *Arthur Rubloff & Co.*, petitioner did communicate with Henke and Heitzig, the persons in charge of selling the motel for the estate, after the time expired in the original offer. Petitioner specifically asked whether he would receive a commission, and Heitzig assured him that he should be entitled to such if the court approved the commission. Heitzig also told petitioner that he would have to procure a buyer that would offer $150,000 to $160,000 in order to obtain a commission. The petitioner did just that. In addition, Henke was notified in writing as to the name of the buyer, just as he had required at the first sale, and this was done at Henke's suggestion. Heitzig, Henke, and the court were aware that the petitioner appeared at the auction with Brooks, and the property was sold to Brooks in open court without Heitzig or Henke making any effort to disclaim the right of petitioner to a com-

mission. Clearly, there was ratification of the acceptance of the seller's offer in this case.

The administrator and heirs do not argue or maintain that Heitzig was not the agent for the estate or that he did not have the authority or apparent authority to bind the estate. (See *Stone v. Brown* (1987), 162 Ill. App. 3d 405, 515 N.E.2d 384 (a case involving the question of an agent binding an owner of real estate to a brokerage contract).) There was no showing why or how Heitzig lost his power or authority to make a binding offer for a cooperative commission between the first and second sale. The fact that the sale and commission would be conditional upon approval by the court did not make Heitzig's offer to petitioner of less value than the same offer as to the first sale. There is sufficient evidence to show an oral contract between the estate and petitioner based upon a renewal of the offer by Heitzig to petitioner of a commission, if petitioner produced a successful bidder and, in addition to the terms in the first sale, if the bid was $150,000 or more.

We need not stop with an oral contract and/or a ratification of the sale by the estate. The petitioner himself made an offer that can be inferred from the facts. When the petitioner contacted Henke and Heitzig, he in effect made an offer to produce a buyer for the motel at a purchase price of $150,000 or more, in return for a commission of 3%. Henke and Heitzig, as agents for the estate, accepted the offer by selling the property to Brooks. Clearly, there was a brokerage contract established by the facts.

Whether we find that there was an express contract, or an implied contract, or a unilateral contract, or a ratification by the estate of an acceptance of a prior offer made by the estate, or a bilateral contract based on mutual offers and acceptances by Heitzig and the petitioner, the final result is that a binding contract was established that should be enforceable against the estate.

Counsel for the heirs complains that by allowing a commission for the sale, there would be two brokerage commissions, one commission for Henke and one for petitioner. Henke, however, was the auctioneer and served only in that function. Henke never procured the buyer, he only provided the means (via an auction) for the buyer and seller to agree to a price for the motel. Once again, why the difference between the first sale and the second sale? There would have been two "brokerage commissions" if there had been a successful first sale.

The heirs also complain that if the court had accepted Patell's bid of $153,000, the estate would have saved the brokerage commission and, thus, netted more than by accepting Brooks' bid with the attendant commission. This argument completely ignores the fact that with-

out Brooks' bidding Patell would have bought the motel for $125,000 or less.

Accordingly, the judgment of the trial court is reversed, and this cause is remanded to the trial court with directions to enter a judgment in favor of petitioner for the sum of $4,597.50.

Reversed and remanded with directions.

MAAG and CHAPMAN, JJ., concur.